Argued January 10, affirmed May 16, petition for rehearing denied
September 5, 1951

BRANCHFIELD, Trustee, *v.* McCULLEY et al.

231 P. 2d 771
235 P. 2d 334

*Don R. Newbury,* of Medford, argued the cause for appellants. With him on the brief was Gus Newbury, of Medford.

*George W. Kellington,* of Medford, argued the cause for respondent. With him on the brief were George M. Roberts and Edward Branchfield, both of Medford.

Before BRAND, Chief Justice, and HAY, ROSSMAN, LATOURETTE and TOOZE, Justices.

ROSSMAN, J.

This is an appeal by three of four defendants from a decree of the circuit court which impeached as fraudulent a deed signed July 18, 1946, by the defendants, J. W. McCulley and Ferroll Viola McCulley, husband and wife; the deed named as grantee Gordon D. Allard, a third defendant. The appellants are the two McCulleys and Mr. Allard. The latter is the son of Mrs. McCulley and the stepson of her husband. The plaintiff, who is now the respondent, is the trustee in bankruptcy of the two purported grantors whom we just named. The complaint named as a fourth defendant the registrar of titles for Jackson County, that being the county in which the real property described in the challenged deed is situated. The registrar has no personal interest in the suit and filed no answer; he is not a party to the appeal. When we use the term "the defendants" we will mean the three appealing defendants.

The assignments of error follow:

"The court erred when it failed to decree that the premises described in the pleadings were the homestead of the McCulleys at the time of the sale.

"The court erred when it failed to decree that there was no fraud in the transaction between the grantors McCulley and the grantee Allard resulting in the conveyance of said premises to Allard.

"The court erred when it failed to decree that the defendants McCulley have no interest in said premises.

"The court erred when it failed to decree that the defendant Allard was the absolute fee simple owner of said premises.

"The court erred when it failed to find and decree that the Trustee in Bankruptcy has no interest in said premises.

"The court erred when it failed to enter a

decree in favor of defendants as prayed for in defendants' answers.''

In 1945 J. W. and Ferroll Viola McCulley, who signed the challenged deed, were married. Gordon Allard, grantee, was born January 18, 1928, and was slightly less than 21 years of age at the time of the trial. When the deed was signed he was 17½ years old. Although he appeared by guardian ad litem, we will refer to him as Gordon.

June 20, 1947, each of the McCulleys voluntarily filed a petition in bankruptcy and on June 24, 1947, each was adjudged a bankrupt.

The plaintiff contends that the defendant, J. W. McCulley, on and prior to July 18, 1946, owned the parcel of real property which is described in the challenged deed, subject to his wife's dower interest. The property consists of approximately two acres of land improved with a dwelling house. It was worth when the challenged deed was executed ''probably $6,000'', according to Gordon, and was encumbered with a mortgage originally in the amount of $3,500, but having an unpaid balance of $3,392. The plaintiff claims that the two McCulleys were heavily in debt July 18, 1946, when they signed the challenged deed, that they were upon the threshold of insolvency and executed the deed without consideration for the purpose of defrauding their creditors.

The defendants admit that each of the McCulleys, eleven months after signing the deed, filed a petition in bankruptcy, but assert that on the day the deed was signed neither owed anything except current accounts. All three defendants claim that the deed was signed for lawful purposes, that it is a valid instrument, that it actually conveyed to the grantee the property de-

scribed in the instrument and that no party to the transaction was prompted by an improper motive. According to the position taken by the defendants at the trial, Gordon paid for the property, together with "an old International truck and trailer," in the following manner: (1) he canceled as to principal a purported promissory note in the denomination of $7,350 which the defendants claim McCulley signed January 6, 1942, in favor of Gordon; and (2) he discharged the balance of $3,392 owing upon the mortgage which encumbered the property involved in this suit.

The defendants also contend that the property in question was the homestead of the McCulleys and as such was exempt from the claims of their creditors. Based upon that premise, their argument is that the McCulleys' creditors had no claim to the property and that, therefore, they (the McCulleys) were at liberty to do with it as they chose.

The plaintiff concedes that when the challenged deed was signed (July 18, 1946), satisfaction of the mortgage was entered, but denies that Gordon was the person who provided the money. He also denies that Gordon loaned to McCulley $7,350 on January 6, 1942. He urges that the sole purpose of the deed was to hinder and defraud the McCulleys' creditors.

The attacked transfers deprived the McCulleys of everything available to their creditors for the satisfaction of their accounts. After the transfers, the McCulleys still possessed some assets, such as uncollectible accounts, but there is no claim that their creditors could have realized anything out of them.

It will be noticed that the defendants, in order to support the challenged conveyance, contend that Gordon, at the time of its purported occurrence, canceled

the principal of a note for $7,350, which the defendants say was given to him by McCulley January 6, 1942, and paid upon the mortgage which encumbered the property the balance of $3,392. Gordon was then 18½ years of age. They also claim that on January 6, 1942, when Gordon was 14 years of age, he had more than $7,350 cash and loaned the sum just mentioned to Mc-Culley, taking the note above described. According to their further contentions, Gordon possessed approximately $4,000 cash when he satisfied the mortgage. The plaintiff does not concede that Gordon had those sums. Whether or not he had them is important in this case, for, if he did not, then he did not supply the purported consideration for the questioned conveyance. The claims that he possessed $7,350 or more on January 6, 1942, and about $4,000 July 18, 1946, are not supported by any writing or entry. The testimony that he possessed those sums was given by the defendants. A sister of Mrs. McCulley supported in part the testimony concerning the $4,000 sum.

The above will suffice as an introductory statement of the contentions of the parties. We shall now consider the assignments of error and in so doing will examine all six of them together.

The general principle of law which governs this controversy has been reduced to statutory form and in that form reads as follows:

"Every conveyance * * * made with the intent to hinder, delay or defraud creditors * * * as against the person so hindered, delayed, or defrauded, shall be void." Section 70-407, O.C.L.A.

The parties are not in disagreement as to that principle. Their dissension pertains to the facts.

As indicated, the grantee of the challenged deed

is the son of one of the grantors and the stepson of the other. Although all courts do not hold that a transfer of assets to a near relative, made by a grantor who faces financial ruin, creates a presumption of fraud, all, nevertheless, scan such transactions with care and view them with suspicion: 37 C.J.S., Fraudulent Conveyances, § 383, p. 1212, and 24 Am. Jur., Fraudulent Conveyances, § 219, p. 335. This court has always scrutinized every such transaction carefully and has held that proof showing such a transfer constitutes a prima facie case of fraud, requiring the grantee to come forth with proof showing that the conveyance was made bona fide for a valuable, adequate consideration: *Orsen v. Siegle,* 170 Or. 153, 132 P. 2d 409; *Orr v. Bauer,* 156 Or. 409, 67 P. 2d 770; *Marion Automobile Co. v. Brown,* 127 Or. 551, 272 P. 914; *Van Riper v. Davenport,* 121 Or. 474, 245 P. 316, 256 P. 193; *Willamette Grocery Co. v. Skiff,* 118 Or. 685, 248 P. 143; *Jones v. Beers,* 118 Or. 317, 246 P. 711; *Sitton v. Peyree,* 117 Or. 107, 241 P. 62, 242 P. 1112; *Blackabee v. Seaweard,* 112 Or. 675, 231 P. 146; *Clarke v. Philomath College,* 99 Or. 366, 193 P. 470, 195 P. 822; *Stubling v. Wilson,* 50 Or. 282, 90 P. 1011, 92 P. 810; *Robson v. Hamilton,* 41 Or. 239, 69 P. 651; *Wright v. Craig,* 40 Or. 191, 66 P. 807; *Bank of Colfax v. Richardson,* 34 Or. 518, 54 P. 359; *S. Marks & Co. v. H. G. & E. G. Crow,* 14 Or. 382. Not only does a close family relationship call upon the grantee to clear the transaction of all taint of fraud, but the same call is imposed if there existed between him and the grantor a confidential, close business or social relationship. The decisions so holding are included among those which we have just cited. We shall now consider the relationship which existed between the three defendants.

The McCulleys and Gordon lived together as a family in the same house. The situation was an unconventional one, for, although the McCulleys lived together as husband and wife for the many years mentioned in the record, they were not married to each other until 1945. McCulley was then 45 years of age. An unsupported assertion is made in the defendants' brief that a common-law marriage was consummated in Texas while they were living there. Nothing of that kind was intimated during the trial, and the assertion must be disregarded. It is clear, however, that the three lived together as a family for many years and that the relationship was continued after a marriage ceremony was performed in Vancouver, Washington. From the latter part of 1942 to July or August of 1946 the abode of these three people was the property which we have mentioned.

No father could have been more generous with his offspring than McCulley was with Gordon, if the defendants told the truth. Although the McCulleys' circumstances were so humble that they could readily place all of their furniture and household equipment in a pick-up truck in November of 1942, when they moved from Texas to Oregon, they never charged Gordon anything for room and board. It is true that Gordon had not yet reached his twenty-first birthday on the day of the trial, but the significance of the omission to charge him anything for his keep arises from the fact that the defendants claim that when he was only a youth he had saved thousands of dollars. According to them, Gordon had more than $7,400 by January 6, 1942, when he was 14 years of age, and on that day loaned to McCulley $7,350. We have mentioned the promissory note of $7,350 which the defendants say

McCulley signed in favor of Gordon January 6, 1942. The note, it is claimed, was given to evidence the borrowing. Mrs. McCulley, according to the defendants, was the keeper of Gordon's money and custodian of the note, assuming that it was issued. The McCulleys' circumstances, when contrasted with the asserted wealth of this 14-year-old Croesus, were meager. They, together with him, lived in a rented house near Velasco, Texas. The home's furnishings were spare. McCulley was then employed by his brother, D. C. McCulley, upon a farm. An index to his financial status is furnished by his answer to a question which inquired whether he gave Gordon security for the purported loan of $7,350. He answered, "I never had nothing to mortgage." Mrs. McCulley swore that before the purported loan was made she kept Gordon's money for a while in a box, later in a chest, but for the most part in a belt which she wore upon her person. She even indicated that she may have kept it for a month or two in a friend's safety deposit box. In November of 1942 the three defendants moved to Oregon and shortly McCulley engaged in a logging operation and Gordon went to school. In the school vacation period of 1943 when Gordon was 15 years of age, McCulley hired him, so the two swore, to operate a farm and paid him $1.25 per hour, or "probably $700.00" that summer. According to the defendants, Gordon worked for McCulley in logging operations in the succeeding summer school vacations up to 1946 with the exception of one year when he was employed by McCulley's brother who had moved to Oregon. By this time the rate of pay had become $1.50 per hour, so the defendants claim, and each summer a total of $800 or more was earned by Gordon. In 1946 Gordon quit school and in

the latter part of 1946 or 1947 McCulley went to a California mining camp where before long he was joined by the other two defendants.

In all of the period which we have reviewed Gordon lived with the McCulleys, but made no contribution to the household expenses. During that time McCulley's needs forced him to place a mortgage of $3,500 upon the home, and, assuming the verity of the defendants' testimony, he continued to owe his stepson the purported debt of $7,350. In mentioning the subject we have no intention of adjudging the omission of the McCulleys to charge Gordon for his board and room, but, since the situation within this family was uncommon, their asserted financial transactions back and forth demand consideration. The family relationship served in this case a twofold purpose: it accounted in part for Gordon's absence of living expenses and for his purported sizeable accumulation. Accepting the testimony as truthful, the family relationship was supplemented by another upon the part of McCulley and Gordon—that of employer and employee—and by still another upon the part of Mrs. McCulley and Gordon—custodian and depositor of the boy's assets.

We believe that the ties between the three defendants render this a proper case in which to look to the three for an explanation of the transaction out of which the attacked deed issued. The transaction—if it occurred—was consummated in the seclusion of the family circle and was observed by no one except the three participants. In fact, not only did the transaction concerning the note and the deed take place within the isolation of the home, but even the consideration, assuming that it was possessed by Gordon, was accumulated for him by his mother, unseen by anyone except

the members of the family. Hence, this is a proper case in which to employ the time-tested rule delineated in the many decisions which we have cited.

The explanation given by the defendants as to the manner in which Gordon acquired more than $7,350 by the time he was 14 years of age, and something more than $4,000 additional in the next four years, must be scrutinized by prying eyes. It must be placed upon the witness stand for cross-examination by common experience. Gordon testified that he and the McCulleys lived in Velasco, Texas, in the four years, 1939, 1940, 1941 and 1942. During the summer school vacations of those four years, according to him, he worked for the brother of McCulley, whom we have mentioned. The brother's name was D. C. McCulley. Gordon called him Gyp McCulley, and, according to him, the brother

> "had a lot of these ranches—different places. He had horses on the one where we lived, and I took care of them—any odd jobs—anything that had to be done—errands. He usually had equipment torn down and somebody had to go and get parts—this, that and the other thing. I usually did it."

Continuing, Gordon testified:

> "Q. During the time you were working for Mr. McCulley's brother down there, approximately what was your total income?
> "A. I suppose right around $300 a month.
> "Q. What did it total up?
> "A. I imagine right around $3,800."

He swore that in each of those four summers he was paid approximately $900 and that it may have been more. The McCulleys gave testimony to substantially the same effect. In the summer of 1939, when he claims that his vacation pay of $300 a month began, Gordon was 11½ years of age.

The period is not so far in the past but that the mind recalls poignantly that in the twelve months in which Gordon claims that he, a mere boy, earned $3,800, a severe depression had settled, not only upon our nation, but also upon the whole world. Many men who were physically and mentally above the average searched in vain for employment and were able to eke out an existence only by resort to the largess of their Government in the form of W.P.A. projects. Gordon's assertion that he earned the aforementioned money is supported by no one except the McCulleys. No writing, no cancelled check, no deposit slip and no bookkeeping entry corroborates this claim that a boy, in the midst of mankind's worst financial depression, earned and received the munificent farm wage of $300 monthly. If McCulley told the truth, Gordon again worked for D. C. McCulley in 1945. This time he worked for him in Oregon in a sawmill, but his wages were less than he received when he was a mere child running errands.

The record warrants a belief that D. C. McCulley was living when this case was tried; in fact, it shows affirmatively that as recently as 1946 he was in Oregon. He was not produced as a witness to corroborate Gordon's claim that he received the aforementioned salary. No explanation was given for his absence from the trial. There is nothing in the record which could account for his paying Gordon the inordinate wage of $300 a month. No one described Gordon as a youth of endearing attributes, and no witness testified that D. C. McCulley possessed wealth or manifested fondness for Gordon.

We have mentioned the fact that the defendants assert that in 1942 Gordon loaned McCulley $7,350 and

that after making the loan he still possessed some money. Mrs. McCulley thought that the surplus was $100 or more. The evidence of which we have taken note accounts for only $3,800 of the purported accumulation. We come now to the explanation given for the other $3,650 or so. Gordon swore that his father sent to his mother for him various sums totaling about $4,000. Mrs. McCulley gave similar testimony. In that manner the defendants account for the balance. According to Gordon, the money came in the mails "sometimes in cash, and sometimes in a money order." How it happened that his father sent the money was left unmentioned. The record supplies no intimation as to the father's occupation, whereabouts, first name or financial worth. Mrs. McCulley testified:

"Q. Were you and Mr. Allard divorced?

"A. Yes, sir.

"Q. Where?

"A. That you will have to ask Mr. Allard, because I don't know.

"Q. When?

"A. I don't know.

"Q. Do you know that you are divorced from Mr. Allard?

"A. I have his word for it.

\* \* \* \* \*

"Q. Did you ever see a copy of the decree?

"A. No, sir, but I didn't question his word."

Astounding as those answers are, they are by no means the only instance in which the defendants drew over an important phase of the case a penumbra of ignorance when penetrating light was demanded. Time after time the defendants were oblivious to the fact that the burden was upon them to lift from the challenged

transaction the veil of family secrecy and lay bare the facts.

Gordon swore that his father visited him "once in a while" but never gave him any money directly. The two saw each other only three times in the period of 1935 to 1939. In the period of 1942 to 1946 two visits were made. No visits whatever occurred, so Gordon swore, during the four years which the three defendants spent in Texas. If the father and son exchanged any correspondence, no witness mentioned the fact. If a friendly, let alone an affectionate, relationship existed between the two, the record bears no evidence to that effect. Mrs. McCulley testified that Gordon's father gave her many sums of money for Gordon. She was emphatic that no remittances were sent through the mails. Upon one occasion, if she spoke the truth, Gordon's father gave her $1,000 in a lump sum, but she protested that she could not recall the time. Referring to her erstwhile husband and herself, she said, "He saw me more often than he did the boy." Thus, we have the singular situation, if the truth has been told, in which a husband who divorced his wife visited her more frequently than he did his boy for whom he was contributing uncommon sums of money.

It is in the above manner that it is claimed that Gordon accumulated more than $7,350 by January 6, 1942, when he is said to have loaned McCulley $7,350.

The above is the manner in which it was claimed at the trial that a 14-year-old boy had accumulated more than $7,350 by January of 1942. Since the defendants ask us to accept as truthful their testimony, it is important to compare the explanation just reviewed with any other available explanations given by them. Mrs. McCulley, while testifying at the bankruptcy hear-

ing, gave an account of the purported accumulations of which we will now take notice. It was reviewed with her when she was upon the witness stand during the present trial. We now quote from her testimony given in this case:

"Q. Didn't you testify at that hearing that he never gave you the money; that he gave it to Gordon?

"A. No, sir. I don't think I testified to anything like that.

"Q. At that hearing Mr. Branchfield asked you (reading): 'Did Mr. Allard customarily send him large amounts of money?' and didn't you answer 'He didn't send it. He would give it to him when he would come to visit. In the time I have been up here he gave about fifty dollars a month. He knew I was saving up for the boy's education and to set him up in some kind of business.'?

"A. Yes, sir. That was a mistake.

"Q. Then you were asked the question 'And he gave you fifty dollars a month over what period of time?' and you answered 'It started in 1932. It figured out about fifty dollars a month.' Then you were asked the question 'Did he at the same time give you any money for your own support?' and didn't you answer 'No, sir.'?

"A. Yes, sir.

"Q. You were also asked 'How did it happen that Gordon was able to lend $7,350 to Mr. McCulley in 1942? Where did he get that much money?' and didn't you answer 'Well, when I would have money over, I would put it away for Gordon—over our living expenses; and money he had given to him while he was a youngster, he saved, and it figured out that he had that much.'

"A. Yes, sir.

"Q. You were asked 'How did you keep that money? Did you keep it in a bank?' and your

answer was 'I kept it in the safety deposit box.' Is that now your answer?

"A. I did. I kept it in a safety deposit box in a money belt.

"Q. You were also asked 'You kept cash in a safety deposit box?' and was not your answer 'Yes, I did. Mr. McCulley didn't know how much I had.'?

"A. No, he didn't have any exact knowledge of how much I had.

\* \* \* \* \*

"Q. You also answered 'Well, when I would have money over, I would put it away for Gordon— over our living expenses; and money he had given to him while he was a youngster, he saved; and it figured out that he had that much.' Did you have any explanation you want to make about that testimony?

"A. What I meant by that, when I had money over my living expenses from my work I would put it away toward Gordon's fund to help him when he was older.

"Q. Do you mean you were contributing to Gordon's funds as well as Mr. Allard?

"A. Well, no. When I would have a few dollars left over the living expenses, I would put in his income—"

Thus, we see that the explanation given by Mrs. McCulley during the bankruptcy hearing and the one given by the defendants at the trial of this suit conflicted in highly important phases of this case. The explanations conflict as to the source of the purported wealth and where it was kept while it was accumulating. Both explanations cannot be true. Only a short time intervened between the two appearances upon the witness stand and, accordingly, it does not seem that a faulty recollection can account for the contradictions.

If, notwithstanding the fact that the record affords good cause for distrusting the defendants, their word is nevertheless accepted as truthful, still their testimony as given at the trial, if believed in its entirety, does not indicate that Gordon possessed $7,350 in January of 1942. Unless he had at least that much money in January of 1942, he could not have loaned it to McCulley.

Mrs. McCulley testified that her ex-husband stopped paying for Gordon in 1945 or 1946. In 1946 the boy became 18 years of age and she thought that was the reason why the support money ceased. Gordon testified as follows:

"Q. When did your father quit sending you money?

"A. I believe it was in 1946."

Thus, the support money upon which the defendants depended to build up the total accumulation to $7,350 by January 6, 1942, was not received in its entirety until three years after that day. If the amount paid by Gordon's father after January 6, 1942, was substantial, then Gordon had substantially less than $7,350 when it is claimed that he loaned McCulley that sum of money. The defendants, however, leave that situation unmentioned, and in claiming that Gordon had $7,350 January 6, 1942, do nothing more than add his purported wages to the purported total support money and thereby reach the desired sum.

In endeavoring to determine the truthfulness of the claim that the father paid his ex-wife approximately $4,000 for the support of his son, it is permissible, we believe, to inquire how the father felt about entrusting the custody of his boy of impressionable years to a woman who was living in a meretricious relationship

with a man. If the father took umbrage at that situation, the defendant left the fact wholly unmentioned. If the father ever inquired what was being done with the money which he was paying, that fact was left undisclosed. How it happened that the father continued to pay when the payments were not being spent for Gordon's benefit is not answered by the record. Nor do we know how it happened that the purported payments continued for four years after the total paid up to that point had been loaned to the mother's paramour. And let us remind ourselves that it was loaned to a libertine who could give no security whatever and who never paid a cent of interest upon the loan. One might expect that after the father had contributed these sizeable sums of money, which, according to the defendants, were absorbed later by the property that is the subject matter of this suit, he would have testified in behalf of his son and would have supported the latter's claim to the property. Yet he was not a witness and no explanation was given as to his whereabouts or his absence from the trial.

According to the defendants, Gordon had $100 or more January 6, 1942, in addition to the $7,350 which on that day he claims he loaned to McCulley. Further, he had, if the defendants told the truth, about $4,000 July 18, 1946, when the challenged deed was signed. The sums total $11,550. That, however, is not all that the defendants claim was given to or earned by Gordon. The latter swore that in the periods we have mentioned he purchased and paid for a motorcycle, a Ford and two Chevrolet automobiles. He and his mother testified that each month he kept out of his paychecks approximately $40 for spending money before handing the balance to her. If the foregoing is the truth, Gordon,

before reaching his eighteenth birthday, had accumulated approximately $15,000. Yet his memory and knowledge of figures was evidently severely limited. For instance, he did not know how much he possessed when the purported loan of $7,350 was made, nor did he know where his mother kept his money. He had no knowledge of the place in which she safeguarded the note. When asked about the wages and earnings which are attributed to him in the foregoing statements, he repeatedly employed such terms as "I imagine", "I suppose" and "I don't know". He even protested that he could recall the month or the year when the purported loan of $7,350 was made. It may be that a person whose memory is deficient and whose knowledge of figures is scant can earn and accumulate sizeable amounts, but when such claims are made in their behalf, their limitations are worthy of consideration.

Fathers do not borrow from their immature children, and men of good will do not procure loans from widows and juveniles save under exceptional circumstances. Especially do men who can give no security repel all suggestions that they engage in transactions of the kind to which we have just adverted. Therefore, when one is asked to believe in this case that a boy, 14 years of age, possessed $7,350 in cash and loaned it to one who sustained toward him an undocumented relationship of stepfather, he at once inquires who broached the subject of the loan and what did the borrower propose to do with the money. The following is the only explanation as to how this loan was projected; it was given by McCulley:

"A. I never asked him, but him and his mother had discussed it. I knew they had the money, and I asked if they would lend it to me.

"Q. And they loaned you the money?

"A. That's right.

"Q. How old was the boy then?

"A. I couldn't tell you just how old. He might have been 13 or 14—he might have been 12, 13, 14 years old.

"Q. Did he talk about lending this money and taking a note?

"A. I borrowed the money.

"Q. Did you talk about it any length of time?

"A. I didn't usually talk about any business deal I have but just a few minutes to anybody."

The foregoing is the explanation as to how this "business deal" was consummated. McCulley swore that he always had at hand a pad of note forms and that, resorting to his pad, he obtained one, filled in the vacant spaces, signed it and got the money. Thus, if the truth was told, a borrower who described himself as "I never had nothing to mortgage" obtained with rare expedition a loan of $7,350 at four per cent interest from a 14-year-old boy.

Whether or not the sizeable sum of $7,350 was placed by McCulley in a bank or a sock after the purported loan was made was left unmentioned at the trial. If it was deposited in a bank, the latter's ledger sheet would be a most welcome item of evidence. But, again, we are left in the dark, and if belief is accorded to McCulley's word it must rest upon his ipse dixit. McCulley gave the following brief explanation as to what he did with the money:

"I was buying a bunch of trucks down there— every truck I could put to work. Of course, you couldn't get ahold of them much, and I used all the money I could to buy equipment. At the same time I was contemplating going into this logging busi-

ness. I used it in buying the trucks and equipment in the logging deal. Some of them I brought up here with me.''

Until McCulley had spoken the above-quoted words he had identified himself as a miner, although it seems he worked upon his brother's Texas farm as a sort of handyman in the four-year period which we have mentioned. His quoted words speak of a contemplated venture in Oregon in the logging business. Sometime after his return to Oregon he engaged in logging and a short experience in that business led to his insolvency. If McCulley borrowed $7,350 from Gordon, the money was received January 6, 1942. The three defendants did not leave Texas for Oregon until eleven months later. No one explained why $7,350 was borrowed in January, 1942, to finance the purchase of logging trucks and equipment when the logging venture would not be undertaken for at least eleven months. How McCulley expected to purchase logging equipment in a non-timber area was not divulged. By reverting to the quoted testimony, it will be seen that he said, ''Some of them (trucks) I brought up here with me.'' The only vehicles which the three defendants brought to Oregon from Texas were a Chevrolet automobile, to which they had attached a house-trailer in which they lived, and a pick-up truck connected to a trailer containing their belongings. McCulley gave the following description of the trailer which brought to Oregon the family's belongings: ''It was a home-made trailer, made out of a Plymouth rear end and a box put on it and sides around it.'' Clearly, equipment of the kind which McCulley had was unsuited to logging operations. Thus, we have no explanation that satisfies the mind as to why the purported borrowing occurred. But, as one

turns from that unanswered inquiry, one is amazed at the conduct of a woman who wishes to be deemed a dutiful mother who permitted a man to take $7,350 of the money of her 14-year-old son and spend it upon the type of automotive equipment which McCulley described. If that type of equipment had to be purchased and if the money necessary for its purchase had to be borrowed, one would expect that the vehicles would be pledged as security for the borrowed money. Nothing of the kind was even attempted, so far as we know.

The purported note provides for only four per cent interest. We have already mentioned the fact that no security was given for the note and that McCulley's reference to his financial status was, "I never had nothing to mortgage." If the transaction occurred, there must have been some talk about the rate of interest, yet all we know about the rate of interest is derived from the copy of the purported note which is in the record; it merely says "four per cent." interest. How it happened that a borrower, lacking in collateral and destined in five years for the bankruptcy court, could obtain $7,350 at four per cent is another phase of the case for which the record gives no answer. No interest was ever paid upon the note and no one essayed an explanation of that fact.

The testimony that Gordon possessed $7,350 or more on January 6, 1942, is not corroborated by any writing, entry or notation. Those who gave that testimony are the three defendants-appellants. Although Gordon swore that his father remitted through the mails at least a part of the $4,000 purported support money, no letter or notation accompanying a remittance was produced. Since the purported accumulation was kept in chests, boxes and belts, it did not make

its way into any bank, and, accordingly, the record contains no entries of a banking nature. No income tax returns were produced, and Gordon spurned an inquiry as to whether he ever filed an income tax return. Although it is averred that the loan was evidenced by a promissory note signed by McCulley, even that note was not produced. As we shall presently show, it is claimed that the note was lost.

It will be seen that McCulley claims that he paid Gordon sizeable wages for four or five years, yet he produced no bookkeeping entries in support of his word. He, however, swore that "a bookkeeping concern in the Medford Building, I believe it was, kept my books." Why the accountant was not placed on the witness stand was left undisclosed.

Mention has been made of the defendants' contention that, in consideration of Gordon's cancellation of the $7,350 note's principal and the payment of the mortgage upon the property in question, the McCulleys conveyed to him the property and gave him an "old International truck and trailer." Gordon testified that the value of the vehicle was about $4,000, but no one revealed what became of it after the challenged transaction. Whether or not Gordon ever needed, received, operated or sold the truck and trailer was not disclosed. How it happened that the "old International truck and trailer" became connected with the transaction about the real property is unknown to us. According to the defendants, McCulley was thinking of selling his mortgaged home in order to procure money for his logging operations. The need for money, so he testified, was the spur that caused him to contemplate the sale. At that point, according to the defendants, Gordon declared that if the home was to be sold he would like

to take it and cancel the $7,350 note. Obviously, parting with the truck and trailer would thwart rather than advance the purpose which McCulley had in mind. Here, again, the story was ended when more facts were demanded to clarify the issues which must be decided.

As we have said, the note which was presented at the trial is not the one that the defendants claim was signed January 6, 1942. Gordon and the McCulleys testified that the purported original note was lost in November, 1942, while they were moving from Texas to Oregon. According to them, the trailer containing the family's belongings, including the note, overturned into a stream and the note, together with other items of property, was swept away by the water. When the bankruptcy hearing was conducted, no note was then presented, although it is now claimed that the substitute note, which is before us as an exhibit, was then in existence. During the hearing the McCulleys were examined concerning the note, but neither mentioned, so each of them concedes, the purported loss of the instrument. The trustee requested that the instrument be produced and after he had repeated his request upon subsequent occasions the substitute note was delivered to him, but no mention was made that it was a substitute instrument.

We shall now consider the evidence which indicates why and when the substitute note was prepared—assuming, of course, that an original was actually signed in January, 1942. The testimony upon this phase of the case is conflicting, although it was given exclusively by the defendants. After Gordon had testified that the substitute note was made "right around two

years'' before the purported conveyance of the property was made to him, the following occurred:

"Q. And you had it about two years before you canceled it; is that right?

"A. Well, I don't remember approximately.

"Q. Was it three years?

"A. It could have been three or four.

"Q. But you do know you had it for a long time; Mr. McCulley did the honest thing and replaced the one you lost with this note, Plaintiff's Exhibit '6'.

"A. That's right.

"Q. You came up here in 1942?

"A. That's right.

"Q. Did he give you this note, Plaintiff's Exhibit '6' in 1943, around there or the first part of 1944?

"A. Well, I believe it was just as soon as we got back from this trip to Texas."

He said that after he received from McCulley the substitute note, "I gave it to Mother and she put it with my other things" and safeguarded it for him until he canceled it upon the consummation of the challenged transaction. Thus, according to Gordon, the purported original note was lost in November, 1942, and the so-called substitute one was prepared shortly after the family reached Oregon in November of 1942. The purpose of giving it was to take the place of the lost note. Such was Gordon's explanation.

McCulley, when asked whether he wrote the substitute note in 1942, answered, "I did not." He then explained: "The new note was written when I transferred the property" and added, "maybe 20, 30, 40 days" afterward. The deed was signed July 18, 1946.

McCulley gave the following as the reason for the preparation of the substitute note:

"He (Gordon) had no way to give me a receipt, and I had nothing to show he owed me that money."

Obviously, he got his facts twisted when he said "he owed me that money." Going on, he declared:

"I wanted a receipt for what I was selling him, and I had the note wrote out."

Upon the back of the substitute note is this endorsement:

"Sept 17 1946
Rec payment in full exceph intrest
Gordon D. Allard"

Thus, McCulley claims that the substitute note was prepared after the purported transfer and that in its canceled form it served as a receipt.

Mrs. McCulley testified that the so-called substitute note did not put in an appearance until the conveyance had been made and the title instruments had been returned to them by the recorder's office. Her exact words were:

"When the title to the property came back, Mr. McCulley had this note, and he brought it in for Gordon to sign over, so he could use it as a receipt. That's when the title to the property came back in Gordon's name.

"Q. Do you know of any reason why Mr. McCulley wanted to use this note drawn and cancelled as a receipt?

"A. Well, I understood it was something to do with his income tax."

From the foregoing we see that Gordon claimed that the purported substitute note was prepared shortly after the asserted loss of the original and that its pur-

pose was to take the place of the original. The McCulleys gave a very different explanation. According to them, the substitute was not prepared until after the attacked conveyance had taken place and its purpose was to serve as a receipt. Since the terms of the alleged transaction did not require Gordon to pay anything whatever to the McCulleys, we cannot understand the need for a receipt.

If Gordon's explanation consists of the truth, his mother possessed the substitute note from the day of its preparation to the time of its cancellation, approximately three and one-half years. If the McCulleys' explanation reflects the truth, Gordon had nothing whatever to evidence his stepfather's purported indebtedness to him after November of 1942.

McCulley, referring to the substitute note, testified:

"I had a bookkeeper over here in the Medford Building—some woman, and she typed the note out."

Here, again, we have mention of a person whose testimony might have tipped the scales, but again the defendants were apparently oblivious to the rule that "evidence is to be estimated, not only by its own intrinsic weight, but also according to the evidence which it is in the power of one side to produce." (Section 2-1001, O.C.L.A., subd. 6.) So far as we know, that woman was in her office in the Medford Building during the trial; at any rate, she was not produced as a witness.

We have now reviewed the evidence which accounts for the origin of the two purported promissory notes and for the asserted disappearance of the original. In analyzing the evidence, we have constantly noticed that

no one except the defendants ever saw either of the alleged instruments; in fact, no one outside of the family circle of three ever heard of the instruments until the McCulleys said something about the averred indebtedness during the course of the bankruptcy hearing. The McCulleys, however, had good opportunities prior to the bankruptcy hearing to have mentioned the notes, if they existed; for instance, the following is taken from the testimony of McCulley:

"Q. Did you ever have an occasion to give a bank a financial statement?

"A. I did. I gave that U. S. National Bank a financial statement one time. I believe they asked me for several others, but I don't know, I was busy and just never got around to make another statement to them.

"Q. Did you ever have occasion to give a financial statement to the First National Bank at Grants Pass?

"A. Yes, sir.

Shortly McCulley conceded that he gave the Grants Pass bank a financial statement in the first part of 1946. He had given the United States National Bank a statement earlier. He admitted that in the statements which he gave to the banks he did not mention the note which he claimed he had signed January 6, 1942. He explained, "I didn't consider them as a financial obligation to be met at a specific time." The note, if made, was payable on demand.

We have stated that during the course of the trial the defendants contended that the consideration which Gordon gave for the real property and the motor vehicle consisted of his cancellation of the principal of the purported note and the satisfaction of the mortgage. At other times the defendants gave a different version

of the consideration. For instance, Gordon's original answer averred:

> "At or about the time when the deed of conveyance to this defendant, referred to in plaintiff's complaint, was made and delivered to this defendant, he paid as consideration therefor to the grantors named therein, the sum of $3,800.00, lawful money of the United States of America, and in pursuance of said consideration so paid, and not otherwise, the said conveyance was made to him."

The answer was not signed by Gordon but by his attorney. As a witness, Gordon disclaimed the quoted averment and in so doing swore that he had not seen the answer before it was filed, that he had not given the attorney the averred information and had not authorized him to file the pleading. However, the attorney who signed the answer continued to represent all three defendants and was their counsel at the trial. Had he not filed the answer, Gordon would have been in default. McCulley admitted that during the bankruptcy hearing he testified that he transferred to Gordon as a part of the consideration, not merely one truck and trailer, but two. As a witness in this case, he said, "I made it in error." It will be observed that all of the purported consideration was in McCulley's favor and that none of it was beneficial to Mrs. McCulley. Yet it is claimed in the briefs of the appellants that she "owned a ¾ interest in the property." No explanation has been given as to why she signed the deed to the home when she received nothing and yet purportedly owned a ¾ interest in the property. Such were the accounts about the consideration.

We have mentioned the fact that Gordon repudiated a part of the original answer which was filed in his behalf and that in so doing he claimed that he neither

knew that an answer was under preparation nor gave any information for inclusion in one. An amended answer was filed a couple of days before the opening of the trial which contained the same account of the consideration that was employed during the trial. If Gordon, in good faith, claims to be the owner of the property involved in this suit, then he is the prime defendant. In that event, the McCulleys have no interest in this suit except a sentimental one based upon their relationship to Gordon. We shall now take note of the testimony given by Gordon concerning the defense of this case. We first mention the fact that he conceded that he received prompt notice of the institution of the suit. We quote the following from his testimony:

"Q. When did you see a lawyer about this case, so far as your end of it is concerned?

"A. Just here lately.

"Q. When?

"A. A little over a week ago.

"Q. Is that the first time you talked with a lawyer about your case?

"A. That's right.

"Q. Well, didn't you know you had a certain definite time to appear in this case?

"A. That's right; I had to appear here the 7th, wasn't it?

"Q. Well, the Summons gave you so long to have a lawyer make an appearance for you in this case or make an appearance yourself. Didn't you have an attorney make an appearance in this case for you?

"A. No, sir.

"Q. Well, an appearance was made for you.

"A. Mr. Newbury made my appearance.

"Q. He made an appearance for you?

"A. That was before I seen him.

"Q. Before you had seen him or talked to your attorney, he made an appearance for you?

"A. That's right.

"Q. Did you hire him as your attorney?

"A. That's right.

"Q. When?

"A. A little over a week ago.

"Q. A little over a week ago you hired him as your attorney?

"A. That's right.

"Q. Up until that time you didn't have an attorney?

"A. That's correct."

Although it is understandable that parents who have had a transaction with their child which has become involved in litigation will seek to protect their child's interests, yet in this instance the parents, before this suit was instituted, had become bankrupts. Accordingly, if Gordon, in good faith, claimed to be the owner of the property, he must have realized that it was incumbent upon him to look out for himself and that the McCulleys, insolvent, as they were, could not be expected to hire attorneys to protect his interests. Nonetheless, as we have seen, Gordon, who claims to be the owner of the property, had not hired an attorney until a week before the trial opened. Seemingly, he had not even conferred with one. It was the McCulleys, whom the plaintiff claims still own the property, who chose the attorneys, saw to it that the case was defended and that answers were filed. The significance of that fact is apparent.

■ We believe it is a matter of common observation that whenever a deed is signed for the bona fide purpose of transferring title, the executed deed is delivered to the grantee or a representative of him. So far as

we can ascertain from a painstaking examination of the record, the deed, signed by the McCulleys and naming Gordon as grantee, was never delivered to him and he never saw it. McCulley, who said that he had an individual by the name of Kyle prepare the deed, testified:

"Q. Did you deliver the deed to Mr. Allard?
"A. I didn't.

"Q. Did you put the deed of record?
"A. I didn't. I think Mr. Kyle did. I don't know."

After Mr. Kyle had prepared the deed, the McCulleys signed it. If the McCulleys intended Gordon to have the property which at that time was the family home, one would believe that the mother would always remember the place where she signed the deed; yet the following are her varying explanations concerning that detail:

1. "The deed was signed in our home."

2. "Q. Then you were asked (bankruptcy hearing) 'Did you sign the deed conveying the house to Gordon?' and you answered 'I don't know.'"

3. "We went down later, Mr. McCulley and I, and signed the deed."

She meant that they went to Mr. Kyle's office and there signed the deed. Mr. McCulley's testimony was also chameleon-like in its varying hues. He could not state when or where he signed the deed, and even added, "I don't remember whether we signed it together or not." If the deed was intended to serve as an instrument of conveyance, one would believe that its execution would be followed by its delivery to Gordon, especially in this instance, since Gordon claimed that he wished to acquire the property as a home. We

pause upon that phase of the testimony long enough to take note of the fact that within seven months after the signing of the challenged deed all three of the defendants had moved from the property and, so far as we can determine, they have no intention of returning to it. If Gordon was actually purchasing this property, it must have been the first that he ever acquired. For that reason, also, one would think that he would have wished to be present when the deed was signed, but, far from being present, he never saw the instrument and it was never in his hands. It will be recalled that the instrument was registered under the Torrens System. No one contends that Gordon was asked whether he wished merely a deed, desired title insurance or whether he cared for the uncommon method of conveyance to which recourse was had, that is, the Torrens System.

What happened to the deed after the McCulleys signed it was left uncertain by the evidence. Gordon, of course, could throw no light upon that phase of the case since he never saw the instrument. McCulley said not a word upon that subject beyond these, "I don't know." Mrs. McCulley, referring to Mr. Kyle, said, "I think he took it to the courthouse for me." Later her counsel directed her attention to testimony which she gave at the bankruptcy hearing, and then the following occurred:

"Q. They asked you the question as to whether you had the deed to the property transferred, and you answered 'Yes', and then this question, 'You mean you went to the courthouse and had it recorded?'; answer 'Yes.' Did you want any explanation about that?

"A. Yes. I am not sure whether I did it or Mr. Kyle did it. One or the other of us did it."

It is clear that the deed somehow got to the recorder's office and eventually a certificate of title was mailed to the McCulleys' home. While it was in the home Gordon saw it. What happened to it next is undisclosed by the record. No one claims that Gordon possesses it. It is not an exhibit. We add that, as a witness, Gordon claimed that he has come into possession of his own belongings and that his mother no longer takes charge of them for him. This, therefore, is an instance in which the purported grantee never saw the deed and was not consulted about any of its provisions. Since Mr. Kyle was selected by McCulley, we assume that he was McCulley's, and not Gordon's, agent. Hence, the handing of the instrument to him, if such occurred, did not constitute delivery to an agent of the grantee. Mr. Kyle did not testify. Gordon, therefore, in asserting his claim of ownership, is unable to say that he ever possessed the title instruments. Seemingly, the purported grantors retained them.

We have mentioned the contention made by the defendants that a part of the consideration for the property was satisfaction, purportedly made by Gordon, of the mortgage which encumbered the property. It is claimed that payment was made out of funds totaling at least $3,800 which Gordon's mother, so the defendants say, held for him as custodian. It is further claimed that Mrs. McCulley had placed that sizeable sum of cash in an envelope and had lodged the latter in a safety deposit box which belonged to her sister, a Mrs. Bennett. When the time came for satisfying the mortgage, Mrs. Bennett, according to further contentions of the defendants, withdrew from the safety deposit box the envelope containing the money, handed it to Gordon and he, in turn, took it to his mother. Accord-

ing to Mrs. Bennett, Gordon and Mrs. McCulley, the envelope was marked with the symbol, $3,800.00. Oddly enough, Gordon, who avowed that he did not know how much money he possessed at that time, did not peer into the envelope and did not count its contents. Mrs. McCulley claims that she extracted from the envelope the required amount and within a day or two handed it to Mr. Kyle. We do not know the latter's connection with the alleged transaction, but he evidently was the person who delivered the money to the mortgagee. It will be seen that after the mortgage was satisfied there remained in the envelope $500 or more and that Mrs. McCulley possessed the envelope. If the money in the envelope belonged to Gordon, then that unexpended balance also belonged to him. Yet he avowed ignorance of what became of the balance. His testimony upon the subject follows:

"Q. Then you must have had some money left. Did she show you what was left?
"A. We didn't discuss how much was left.
"Q. What did she do with it?
"A. I don't know. I suppose she put it back in the box. There wouldn't be any sense of leaving it lay around."

Mrs. McCulley testified:

"Q. Then Gordon had some money left after you paid the mortgage?
"A. Yes, sir.
"Q. What did you do with the money?
"A. I kept it for him.
"Q. Where did you keep it?
"A. The same place I kept the other, in the money belt.
"Q. Back in the safety deposit box?
"A. No. I never took it back to Mrs. Bennett's box after that."

It is impossible to ascertain from the record what became of that unexpended balance. Gordon, however, claimed that before the trial he became the custodian of his own money and was no longer handing his wages to his mother for safekeeping. The fact that Gordon was so disinterested in the sizeable balance that he had no information whatever as to what had become of it may indicate that the money which was in the envelope was not his at all. Unless the money in the envelope belonged to him, his money did not pay the mortgage debt. He was not present when the mortgage was discharged.

After the alleged conveyance was made, no change occurred in the occupancy of the contested property. The McCulleys and Gordon continued to live there in the same way as before. Several months later, however, McCulley departed for the California mining camp which we have already mentioned. After he left, Mrs. McCulley and Gordon continued to reside in the house until the following January when they, too, went to the mining camp. After they had gone, Mrs. Bennett, the aforementioned sister of Mrs. McCulley, occupied the property for a while, and at other times it was occupied by tenants. During his cross-examination, Gordon testified:

"Q. How much have you received as rent since you owned the property?
"A. Not a cent."

From the day of the contested conveyance to the day when that answer was made two and one-half years had passed. A question put to Gordon by his counsel upon redirect examination brought forth from him the information that his attorney had received some rent money. How much was not disclosed.

The McCulleys, as witnesses, conceded that their furniture and other belongings were still upon the property at the time of the trial. After the purported conveyance, Mrs. McCulley continued to deal with the property as owner, as was indicated in an episode which occurred when a fire insurance agent called at the home with a suggestion that the amount of the insurance should be increased. He then delivered to her a fire insurance policy issued in the name of the McCulleys, which she accepted. Gordon, as a witness, admitted that he carried no insurance upon the property. October 18, 1946, three months after the challenged conveyance, McCulley paid the taxes upon the property for the period July, 1946, to July, 1947. May 5, 1948, Mrs. Bennett, the aforementioned sister of Mrs. McCulley, paid the taxes and had the receipt issued in Gordon's name. She performed that act, so she swore, without request from Gordon and paid them in lieu of rent. Later, according to her further testimony, she received reimbursement in cash from him. The plaintiff deems it significant that the payment was made twenty days after this suit was filed.

Gordon at first swore that it was he who paid the taxes upon the property. For instance, he testified:

"Q. Who has paid the taxes?

"A. I have.

"Q. When did you pay the taxes?

"A. I don't remember when they would come due. I believe they are due again. I paid them the last time.

"Q. When did you last pay them, as near as you can tell?

"A. I am not sure, when that was.

"Q. Well, what years did you pay taxes for last?

"A. Ever since I took over that place out there, I have kept them up so far."

As the examination progressed, Gordon retreated from his above all-inclusive claim that he had made all of the tax payments. He limited his claim by saying that he had paid them "once, I believe." Further cross-examination forced him to make another retreat; this time he conceded, "I never paid it. I wasn't here in this country then. I had Mrs. Bennett pay it for me." Even that severely circumscribed claim ran counter to Mrs. Bennett's aforementioned testimony that she paid the taxes without any request from him. And, of course, the testimony given by Gordon before he made his forced retreats failed to acknowledge that his step-father paid the first year's taxes. Gordon's reckless disregard of the facts does not commend him as a reliable source of the truth.

Gordon, in an apparent effort to show that he exercised dominion over the property after the signing of the contested deed, testified that since the latter's execution he made improvements to the property consisting of the addition of a new room to the house, a reshingling of the roof and reconstruction of a part of the foundation. When he was asked by his counsel "Who paid the bills?" he replied, "I did" and estimated that they aggregated "around $800.00." Since that asserted work was done, not more than two and one-half years before the trial commenced, one could reasonably expect that his word would be supported by invoices, bookkeeping entries or canceled checks. None, however, was produced. Upon cross-examination, Gordon testified that he "bought the lumber at the Copeland lumber yard" and that the invoices were sent to him. After he had given that information he

protested that he could not recall whether he made the improvements in 1948 or in some other year. His answer was "I wouldn't say. I am not positive when it was." Upon being asked to produce any of the invoices, he replied, "I had one. I don't know where it is now." He added, "I had records of all of that stuff." At that point the following occurred:

"Q. I realize you might not, but we will likely be here tomorrow. Do you suppose from the adjournment you could refresh your memory as to where you bought the materials?
"A. I could try. I am not sure. I could try."

The next day the following occurred:

"Q. Now, when you were here Friday you said you would look for some invoices of bills for materials delivered to you for the improvements you put on the place. Did you find any?
"A. No, sir. I came down with a cold after I left this place, and I haven't had time yet."

Judging from the size of the transcript of testimony, the trial must have continued for at least another full day, but no invoice was produced. Thus, there vanished another opportunity to have supplied some documentary support for the claims made by the defendants. No invoice, canceled check or other corroborative writing was produced. We observe that although the trial commenced January 7, 1949, the decree was not signed until September 16, 1949, and, accordingly, Gordon had ample opportunity to have offered supporting documents if he possessed or could procure any. None was offered and no explanation of the omission was made.

■■ We shall analyze the evidence no further. The facts which we have reviewed satisfy us that the defend-

ants failed to clear this transaction of damning suspicion. Far from effacing suspicion from the transaction, the defendants enmeshed themselves in self-contradictions, conflicting accounts and dubious explanations which lend no credit to their veracity. Obviously, valid conveyances can be effected within the seclusion of the family circle and, no doubt, hundreds of such transfers occur daily in this state. But the one at bar was consummated under circumstances which at once arouse suspicion and call for explanation. The transaction had its inception in the incredible assertion that a boy, only 11½ years of age, earned $300 a month running errands and doing tinkering work upon a farm at a time when millions of capable men could find no employment whatever. From that implausible beginning the defendants expanded their claim until they ask the court to believe that seven years later the boy acquired the property in question, together with a valuable truck, by paying for them in part with the fantastic salary which it is claimed he received while he was still in short pants. Such quixotic episodes sometimes occur in real life, but more frequently in the fertile imagination of fiction writers. When an appellate court, under the circumstances at bar, is asked to reverse a holding by a lower court adverse to the claim, those who attack the ruling should come prepared to sumbit in their favor at least one corroborative item of evidence. In the present instance, the only document submitted in direct support of any phase of the case was accepted in the bankruptcy hearing at face value; but it later developed in the circuit court that it was a substitute. Transactions which are consummated in an open and bona fide manner leave behind footprints in the form of invoices, canceled checks,

statements of account, banking records or bookkeeping entries showing the course that was taken, and enabling those who wish to retrace the steps to check upon those who went before. Whenever those who made the footprints obliterate them, they afford good cause for suspicion. A self-avowed adventurer who gives a glib narrative, but can point to no footprints, is accorded no credence. Without further analysis, we unhesitatingly express our conviction that the circuit court correctly decided the issues of fact. The deed, in our opinion, was never intended to convey title to Gordon and make him owner of the property; its sole purpose was to hinder and defraud the McCulleys' creditors. It was the duty of the circuit court to rule as it did; that is, to cancel the deed as void. A void deed passes no title.

The record contains sufficient support for the circuit court's holding that Gordon knew of the fraudulent purpose of the alleged grantors. Moreover, we do not believe that the deed was delivered to him, that it was ever in his hands or that he deemed himself owner of the property. We think that it was never intended that he should possess either the deed or the property.

Although the principle of law is not mentioned in the defendants' brief, we have, nevertheless, taken notice of the one which is thus phrased in 16 Am. Jur., Deeds, § 135, page 513:

> "While the fact that a deed is on record is prima facie evidence of delivery, the deposit for recording of a deed by the grantor or his agent and the actual recording thereof do not constitute delivery as a matter of law, for the question remains whether, by so doing, the grantor intended to deliver the deed. It is the intent in depositing the deed for record,

not the fact that it was recorded, that has to be considered in determining from all the evidence whether the deposit was an effectual delivery. * * *''

We repeat that we are firmly convinced that no delivery of the deed was intended or made. In the effective language of the street, the deed was a phony.

■ We have not overlooked the contention that the McCulleys were not, in fact, insolvent when the deed was signed, and that Mrs. McCulley had no creditors even when she signed her petition in bankruptcy. The schedules in bankruptcy filed by each of the McCulleys, and bearing their signatures on every page, refute the contentions now made. When they prepared and signed the schedules they had the service and advice of a responsible member of the bar. We believe that these claims are unmerited and that they reflect adversely upon the veracity of the McCulleys.

There remains for consideration only the contention that the property involved in this suit was the homestead of the McCulleys and that as such it was exempt from liability for their debts. We are prepared to believe that the property was their homestead and that, had they chosen to do so, they could have given the property to Gordon. They, however, did not elect to take that course; to the contrary, they wished to retain the property even in the face of impending financial ruin. The deed which they signed was not intended to make Gordon owner, but to hinder, delay and defraud their creditors.

■ The Chandler Act of 1938, amendatory of the Bankruptcy Act, contains this provision:

''This title shall not affect the allowance to bankrupts of the exemptions which are prescribed by the laws of the United States or by the State

laws in force at the time of the filing of the petition in the State wherein they have had their domicile for the six months immediately preceding the filing of the petition, or for a longer portion of such six months than in any other State: Provided, however, That no such allowance shall be made out of the property which a bankrupt transferred or concealed and which is recovered or the transfer of which is avoided under this title for the benefit of the estate, except that, where the voided transfer was made by way of security only and the property recovered is in excess of the amount secured thereby, such allowance may be made out of such excess.'' 11 U.S.C.A., § 24, 3 Fed. C.A. title 11, § 24.

From an annotation in 161 A.L.R. 1009, at 1025, we quote:

''In the Act of 1938, or the Chandler Act, amending the provision of the Bankruptcy Act dealing with the allowance of exemptions to the bankrupt, a proviso was specifically inserted to eliminate the conflict theretofore existing among the courts with respect to the allowance of exemptions in fraudulently or preferentially transferred property which had been recovered by the trustee, so that it now appears that where the trustee recovers property which has been transferred or concealed, or avoids the transfer thereof, no exemption will be allowed the bankrupt, except where the voided transfer was made by way of security only, in which case exemptions will be allowed out of the property recovered to the extent that the property recovered is in excess of the amount secured thereby.''

■ It is clear that the property involved in this suit falls directly within the words of the proviso which read, ''no such allowance shall be made out of the property which a bankrupt transferred or concealed and which is recovered or the transfer of which is avoided.'' By signing and recording the fraudulent deed, the Mc-

Culleys barred themselves from the exemption which they now seek.

We dismiss as lacking in merit all of the assignments of error.

The decree of the circuit court is affirmed.

ON PETITION FOR REHEARING

*Don R. Newbury*, of Medford, for the petition.

*George W. Kellington, George M. Roberts* and *Edward Branchfield,* all of Medford, contra.

Before BRAND, Chief Justice, and HAY, ROSSMAN, LATOURETTE and TOOZE, Justices.

PETITION DENIED.

ROSSMAN, J.

The defendants-appellants submit a petition for a rehearing which contends that our decision erred in the following particulars:

"1. In failing to find that the conveyance of the homestead-exempt real property in question could not be fraudulent.

"2. In failing to find that there could not be fraud as to any creditor in the conveyance of such homestead-exempt property.

"3. In finding that there was any necessity for showing any or adequate consideration for the conveyance of such homestead-exempt property.

"4. In failing to find that the grantors and grantee had no duty or burden of proving that this conveyance was made for an adequate consideration.

"5. In failing to find that, only a creditor who could be defrauded by such conveyance, has any right to require close relatives to prove an adequate consideration.

"6. In failing to find that as to this homestead-exempt property there were no creditors and there could be none.

"7. In failing to find that no creditor of a

bankrupt and no representative of such creditor in bankruptcy has any right to set aside a conveyance of homestead-exempt property.

"8. In failing to find that because there can be and are no creditors as to homestead-exempt property, there was no one for the trustee in bankruptcy to represent in this case, and that he therefore had no standing in court.

"9. In finding that intent to place the said homestead-exempt property beyond the reach of creditors constituted fraud that could render the deed void.

"10. In finding, contrary to the pleadings of the trustee, plaintiff, and to all of the evidence and admissions in the case, that the deed in question was never delivered and was therefore void.

"11. In failing to find in favor of the appellants."

The petition for a rehearing is accompanied by an opening brief of 46 pages. After the plaintiff-respondent had filed an answering brief, the defendants (appellants) presented a reply brief of 26 pages. The two briefs cite and quote from scores of decisions.

It will be observed that the petition for a rehearing states that, in disregard of the plaintiff's pleading, we found that "the deed in question was never delivered". When we wrote our decision we were absorbed in the evidence and failed to recall the following parts of the complaint:

"That, after being indebted to some creditors of the estates of J. W. McCulley and Ferroll Viola McCulley, as aforesaid, and on July 18, 1946, the defendants J. W. McCulley and Ferroll Viola McCulley made, executed and delivered to the defendant Gordon D. Allard, the son of Ferroll Viola McCulley, a warranty deed conveying unto the said Gordon D. Allard the above described real property, which said deed was recorded by G. R. Carter,

Registrar of Titles in and for Jackson County, Oregon, as Instrument No. 19259, and relying upon which said instrument, said defendant G. R. Carter, as said Registrar of Titles, issued Certificate of Title No. 6378, which names the said Gordon D. Allard as the owner of said property.

"That said warranty deed was executed and delivered by the said J. W. McCulley and Ferroll Viola McCulley without consideration and with intent to hinder, delay and defraud the creditors of the said J. W. McCulley and Ferroll Viola McCulley, and the said defendant Gordon D. Allard accepted and received said warranty deed with knowledge of the fraudulent intent on the part of the said J. W. McCulley and Ferroll Viola McCulley and with intent upon the part of the said Gordon D. Allard to assist the said J. W. McCulley and Ferroll Viola McCulley in their fraudulent purposes, and the said Gordon D. Allard does now hold the title thereto."

The averments just quoted concede that the deed which the McCulleys signed and which named as grantee Gordon D. Allard, to whom we referred as Gordon, was delivered to the latter. Since the complaint states that the deed was delivered to Gordon, we confess our error. In our further consideration of the case we will deem that the deed was delivered. We explain that before writing our decision we read the evidence with care and found in it no indication that Gordon ever saw or received the deed. During the trial the witnesses described in minute detail the course which was taken with the deed from the hour that it was written to its eventual disposition. While those particulars were being unfolded no one mentioned the fact that the complaint conceded the delivery of the deed.

Although the complaint admitted that the deed

was delivered to Gordon, it did not concede that the beneficial interest in the property passed to him. To the contrary, the complaint averred that the deed was executed without consideration and alleged that its purpose was to hinder, delay and defraud the Mc-Culleys' creditors.

The eleven charges contained in the petition, it will be noticed, do not claim that we misstated any fact except the one concerning the delivery of the deed. The brief which accompanied the petition, however, declares that we misstated some facts; it says:

> "The court in its said opinion entirely ignored the undisputed evidence in the case as to who owned the property and who had debts at the time the property was conveyed to Gordon. This undisputed evidence, most of which was offered by the plaintiff, and much of which is documentary, shows that J. W. McCulley owned ¼ of the property and Viola McCulley ¾ of it, and that Viola McCulley owed no debts whatever, * * * .
>
> "The undisputed evidence in the case (as distinguished from 'surmise', 'Speculation', and 'suspicion'), and we wish to underscore the words, *'undisputed'*, and we use the same advisedly, establishes the following: That Mrs. McCulley was the absolute owner of an undivided ¾ interest in this property at the time it was conveyed to her son, Allard, and that Mrs. McCulley owned the other undivided ¼; that Mrs. McCulley never owed any bills whatever and did not owe any at the time of bankruptcy or at the time of the conveyance, * * * ."

Evidently counsel meant that Mr. McCulley "owned the other undivided ¼."

The record shows that November 12, 1935, Frank J. and Emma Schuler signed a deed which described the property in issue and which was the origin of the

McCulleys' interest in it. The typewritten name of the grantee was J. W. E. McCulley. After that name was penned these words, "married to Billy McCulley." The name Billy McCulley appears in no other part of the instrument, and how it happened to be entered after the name of J. W. E. McCulley was left undisclosed by the witnesses. J. W. E. McCulley was seemingly the name that the defendant, J. W. McCulley, employed at that time, and Billy McCulley was an appellation which the defendant, Ferroll Viola McCulley, had acquired sometime around the year 1935. It is clear that Billy McCulley was not the wife of the defendant, J. W. McCulley, when the deed of 1935 was signed, for she herself testified: "I was married in 1945", that is, to the defendant, J. W. McCulley. In 1935 her name was evidently Allard. It is clear that the deed of 1935 transferred no interest in the property to Mrs. McCulley. In fact, she disavowed any claim to the property at that time. We take the following from her testimony:

"Q. Did you have any interest in it at that time?"

"A. Well—no, sir."

Thus, in 1935, when the defendant, McCulley, received the aforementioned deed, the defendant, Ferroll Viola McCulley, was unmarried to him and had no interest in the property.

■ An instrument, signed January 19, 1939, by J. W. E. McCulley and Billy McCulley, described the property in issue and named as grantee "Dwight Calvin McCulley, a widower, and Billy McCulley, married to J. W. E. McCulley." The two signers were the two defendants McCulley. The grantee by the name of Dwight Calvin McCulley was a brother of the defend-

ant, J. W. McCulley. The latter's uncontradicted and unchallenged testimony indicates that, concurrently with the signing of the deed, he obtained a loan from his brother and delivered the deed as security for the repayment of the loan. His exact words were:

"I didn't know how to make a mortgage out, and I deeded him an interest in the place.  *  *  *

"Q. Anyway, that deed from you to your brother was really a mortgage?

"A. That's the same thing."

To make matters clearer, he added, "I never sold it." Mrs. McCulley did not claim that the deed was otherwise than as mentioned by the defendant, J. W. McCulley, who later became her husband. The following is taken from her testimony:

"Q. Did you ever pay any money or other consideration for any interest in that home property?

"A. No, sir."

It is plain that the sole purpose of the conveyance of 1939 was to secure to Dwight Calvin McCulley repayment of the loan which he had made.

May 6, 1944, a deed was signed by Dwight Calvin McCulley and Lamerle McCulley, husband and wife, which described the property in issue and which named as grantees "J. W. E. McCulley and Billy McCulley, husband and wife." It purported to convey "an undivided one-half interest in and to the following: *  *  *  ." As nearly as can be ascertained from the record, the loan mentioned in the preceding paragraph had been repaid when that deed was executed and the purpose of the latter was to reconvey title. Yet the defendants seize upon that deed in part as support for their contention that the defendant, Ferroll Viola McCulley, owned a three-fourths interest in the property. Since title was conveyed to Dwight Calvin McCulley

and Billy McCulley only as mortgagees, those two persons could not convey to either of themselves or to anyone else, except possibly to an innocent third party, a greater interest than they possessed. Their interest was solely that of mortgagees and, of course, when the loan had been repaid it was their duty to reconvey. We believe that our opinion is not subject to the criticism under analysis which the defendants offer.

It will be recalled from the words which we quoted from the defendants' brief that the defendants also say: "This undisputed evidence * * * shows that * * * Viola McCulley owed no debts whatever." Our original opinion said:

"We have not overlooked the contention that the McCulleys were not, in fact, insolvent when the deed was signed, and that Mrs. McCulley had no creditors even when she signed her petition in bankruptcy. The schedules in bankruptcy filed by each of the McCulleys, and bearing their signatures on every page, refute the contention now made. When they prepared and signed the schedules they had the service and advice of a responsible member of the bar. We believe that these claims are unmerited and that they reflect adversely upon the veracity of the McCulleys."

The reply brief which accompanies the petition for a rehearing says:

"Respondent again argues that because Mrs. McCulley signed schedules in bankruptcy identical with those signed by her husband setting forth the same debts and assets, she is bound thereby, in the face of the undisputed evidence submitted by all of the creditors in their proofs and by the testimony in this case, which was undisputed, that she did not owe any of the bills and that they were obligations only of Mr. McCulley."

Mrs. McCulley's petition in bankruptcy, made under oath, declares:

"Your petitioner owes debts   *   *   *   . The schedule hereto annexed marked Schedule A, and verified by your petitioner's oath, contains a full and true statement,"

of the debts. Forming a part of the schedule is an oath reading as follows:

"I, Ferroll Viola McCulley, the person who subscribed to the foregoing Schedule, do hereby make solemn oath that the said Schedule is a statement of all my debts   *   *   *   ."

Thus, Mrs. McCulley, at a time when she was intimately conversant with her financial affairs, swore more than once that she owed debts.

The proofs of claims upon which the defendants rely were described by the witness who produced them at the trial as "all of the claims which have to date been filed."

The answer of the defendants McCulley admitted:

"The defendant, J. W. McCulley and the defendant Ferroll Viola McCulley filed in the District Court of the United States for the District of Oregon their duly verified petitions in bankruptcy, and admit upon information and belief that the plaintiff was appointed the Trustee in Bankruptcy."

That admission certainly authorizes an inference that the defendant, Mrs. McCulley, was a bankrupt. The answer did not claim that she filed her voluntary petition through error, nor that she has sought to withdraw it; withdrawal is permissible: 8 C.J.S., Bankruptcy, § 68, page 478. The existence of a provable and dischargeable debt or debts is essential to one who files a voluntary petition in bankruptcy: 8 C.J.S., Bankruptcy, § 57, page 470. Manifestly, an in-

ference is warranted that Mrs. McCulley was indebted when she filed her petition to be adjudged a bankrupt. We see from the foregoing that Mrs. McCulley wants the bankruptcy court to believe her sworn statements and, based upon them, grant her a discharge from the debts which she lists in her schedule; but she asks us to deem her a self-confessed falsifier, disregard her sworn bankruptcy schedules and hold that she owed no debts when she signed the challenged deed. Such a Janus-faced proposal condemns its proponent. It is unworthy of submission to a court.

In view of the circumstances of which we have taken notice, we do not believe that a trier of the facts was forced to accept as truthful Mrs. McCulley's testimony that she did not owe the debts listed in her petition in bankruptcy. Her credibility as a witness was badly impaired during the trial.

We think that our previous decision did not misstate any fact except the one concerning the delivery of the challenged deed.

It will be recalled that the ninth claim of error set forth in the petition for a rehearing declares:

"In finding that intent to place the said home-stead-exempt property beyond the reach of creditors constituted fraud that could render the deed void."

That statement appears to concede that the purpose of the conveyance attacked in the suit before us was "to place the said homestead-exempt property beyond the reach of creditors", that is, the creditors of the defendants McCulley. Throughout their briefs defendants-appellants contend that a conveyance of exempt property cannot defraud the creditors of the grantors and furnishes the creditors no ground for complaint.

They further contend that we misconstrued the Chandler Act of 1938, that is, the amendment of the Bankruptcy Act. Our opinion quotes the pertinent part of it.

The brief of the defendants-appellants says:

"The state and federal courts and the bankruptcy courts find nothing fraudulent in a debtor taking advantage of the exemption statutes that were enacted for his sole benefit, even though the debtor's intention and purpose is *always* to place the property beyond the reach of creditors. The state and bankruptcy laws urge him to do this. The fact that our defendants did this very same thing and accomplished this very same purpose before any creditor attempted to levy upon their homestead and before they were adjudged bankrupt, certainly cannot prejudice them in the eyes of the law. The only thing this court could find in this case that savored of fraud, and, indeed, the only thing it was possible for it to find that savored of fraud, was the alleged *intent* of the defendants to place the property beyond the reach of creditors."

Going on, the defendants' brief shortly returns to the same theme; this time it says:

"Because of their ignorance of the exemption laws, they only did, in their own way, what the exemption laws had already done for them without their knowledge, and they had done it with exactly the same purpose that underlies the exemption laws. *The opinion in our case penalizes the defendants for having such purpose and intention, in spite of the fact that all exemption laws cry out to every debtor to protect his exempt property from the claims of creditors.*"

The words in italics are underscored in the brief.

It may be that, when the statements just quoted were written, the defendants-appellants intended to say nothing more than that, if the fraudulent intent was conceded, the fact would be immaterial. However, it

will be recalled that the petition for a rehearing does not challenge the portrayal of facts contained in our opinion, with the single exception concerning the delivery of the deed.

We are convinced that the purposes of the deed were fraudulent. The deed was never intended, according to our belief, to transfer to Gordon any beneficial interest in the property. The McCulleys plotted and designed to reserve to themselves the beneficial interest. They intended that the deed should be an imposture and hoped that it would successfully deceive their creditors into a belief that they (the McCulleys) no longer owned the property. The evidence which so indicated met with no objection from the defendants.

The defendants now claim that the purported homestead character of the property was determinative of the case and that the testimony concerning the fraudulent character of the conveyance was immaterial. In fact, they assert that such has always been their view. The brief accompanying the petition for a rehearing says:

> "Our view of the matter, determined before the trial of the case commenced, was that proof of the homestead-exempt character of the property was all that was necessary on our part and would constitute a complete defense."

We accept the statement, but cannot understand why the defendants presented testimony, which, as transcribed, covers more than 150 typewritten sheets, in an effort to prove that the challenged deed was free from fraud and was accompanied with an adequate consideration.

We again quote from the briefs filed by the defendants-appellants:

> "McCulleys have never, in this case, claimed any

homestead exemption whatever. All the pleadings in the case and all the evidence show that almost a year prior to the time McCulleys filed bankruptcy they had conveyed away this property to Gordon Allard and did not own it at the time of bankruptcy, could not make any claim of exemption therein, and did not make any claim of exemption therein at the time of bankruptcy."

The concession that the McCulleys never made a claim to an exemption was well justified. The answer of the defendants McCulley made no claim of exemption. It used neither the word "homestead" nor the word "exemption". The McCulleys' schedules in bankruptcy likewise made no claim of exemption. Another part of the brief declares:

"McCulleys did not plead, and, indeed, they could not plead, any homestead exemption in this property in this case."

Our original opinion said that, if the McCulleys had desired to make a gift of the property to Gordon, they probably could have done so. They, however, neither made a gift nor executed a deed for a consideration. The attacked instrument was a deed only in name. It conveyed no beneficial interest in the property. Its purpose was to hinder, delay and deceive the creditors of the McCulleys.

We see from the parts of the brief from which we just quoted that the McCulleys have made no claim of any exemptive rights in the property, and that they do not contend that the property was their homestead when the suit was filed. In truth, they assert the opposite.

The above being our analysis of the record, it follows that when the McCulleys filed their petitions to be adjudged bankrupts, and also when this suit was

filed, they were the equitable owners of the property in issue. Gordon had no beneficial interest in it whatever. Since the McCulleys made no claim that the property was exempt to them as their homestead, exemption was not an issue in the case.

Since the McCulleys expressly disavow that the property is their homestead and affirmatively assert that (1) they have not plead exemption in this suit, and (2) made no exemption claim in their bankruptcy schedules, they cannot defeat the plaintiff's right to the property upon any contention that the property is exempt to them. Gordon cannot prevail, even though his answer averred that the property was the "home and homestead of said McCulleys" prior to the execution of the deed which named him grantee because no one ever intended that he should own the property.

Exemptions are personal rights and generally can be claimed only by the person entitled to the exemption: *Childers v. Brown*, 81 Or. 1, 158 P. 166, and 22 Am. Jur., Exemptions, § 119, page 90, 35 C.J.S., Exemptions, § 120, page 150. Therefore, the averment in Gordon's answer that the property, prior to the execution of the challenged deed, had been the McCulleys' homestead cannot be deemed an exemption claim on the part of the McCulleys.

We deem it unnecessary to proceed further with a statement of our reaction to the petition for a rehearing. We gave to the petition careful attention, but found no error in our original decision except the one corrected by us in a preceding paragraph of this opinion.

The petition for a rehearing is denied.