### LIVESLEY *v.* HEISE.

Argued 29 March, decided 29 May, 1906.

85 Pac. 509.

FRAUDULENT CONVEYANCES—PARTICIPATION OF GRANTEE.

1. In suits to prevent the consummation of a fraud on plaintiff by transferring property in which he is interested, it must appear that the grantee participated in the fraudulent intent.

FRAUDULENT CONVEYANCES—RELATIVES—BURDEN OF PROOF.

2. Where conveyances are made to near relatives, the effect of which is to prevent creditors from satisfying their claims, the burden of proving good faith is on the grantees.

EVIDENCE CONSIDERED.

3. The evidence shows that the grantees in the present case were not parties to any fraudulent intent that the grantor may have had.

PARENT AND CHILD—EMANCIPATION—RIGHT TO EARNINGS.

4. The earnings of a minor child who has been allowed by his parents to act in business matters independent of their control are not liable to the claims of creditors of the parents.

LEASE—SUFFICIENCY OF CONSIDERATION.

5. A promise not to claim further rent under the terms of a lease is a sufficient consideration for a release of all rights under it, and a promise to pay rent is an adequate consideration for the execution of a lease.

BREACH OF CONTRACT—MEASURE OF DAMAGES.

6. The measure of damages for the breach of a contract to sell is the difference between the purchase price and the market price on the date of delivery.

COSTS ON APPEAL IN EQUITY CASES.

7. Costs and disbursements on appeal in equity cases are assessed as the discretion of the appellate court may suggest.

From Polk: WILLIAM GALLOWAY, Judge.

Statement by Mr. Justice Moore.

This is a suit by T. A. Livesley and John J. Roberts, partners as T. A. Livesley & Co., against A. Heise, Rachel E. Heise, his wife, and W. C. Heise, their son, originally to enjoin the disposal of certain hops grown in 1903, and to compel the specific performance of a contract to sell and deliver the crop to plaintiffs. The complaint sets out the facts constituting their right to the hops, and alleges a conspiracy on the part of the defendants to defraud plaintiffs. A demurrer to the complaint was sustained, the temporary injunction was dissolved, the suit dismissed, and plaintiffs took an appeal, on the trial of which the decree was reversed, the demurrer overruled, and the cause remanded for further proceedings: *Livesley* v. *Heise,* 45 Or. 148 (76 Pac. 952). While that appeal was pending the hops were sold and shipped out of the State. When the mandate was sent down plaintiffs filed a supplemental complaint, stating the changed condition of the hops and praying a recovery against the defendants of the value of the crop as damages for the breach of contract. The defendant Heise separately, and his wife and son jointly, answered, denying the material allegations of the original and the supplemental complaints, and averring that in 1901 and the year following, Heise cultivated hopyards leased to him, and delivered the crops grown thereon to plaintiffs, but that in consequence of his financial embarrassment he was compelled to relinquish his rights under the leases and to surrender the possession of the demised premises to the owners thereof, and that Mrs. Heise and her son leased the same yards and raised hops thereon in 1903, in which Heise had no interest. The allegations of new matter in the answers having been denied in the replies, a trial was had, and plaintiffs were awarded a recovery against Heise in the sum of $2,764.80, as the damages sustained by reason of his failure to perform the terms of his contract, but Mrs. Heise and her son were decreed to be the owners of the hops in question and entitled to their costs and disbursements, and the plaintiffs again appeal.　　Modified.

For appellants there was a brief over the names of *W. M.*

*Kaiser, W. T. Slater* and *Teal & Minor,* with oral arguments by
*Mr. Woodson Taylor Slater* and *Mr. Wirt Minor.*

For respondents there was a brief with oral arguments by
*Mr. George Greenwood Bingham* and *Mr. Peter H. D'Arcy.*

MR. JUSTICE MOORE delivered the opinion of the court.

The transcript shows that about January 26, 1900, the de-
fendant A. Heise leased two hop-yards in Polk County, con-
taining 25 and 20 acres, from his mother-in-law, Mrs. N. W.
Harris, and brother-in-law, E. L. Harris, respectively, for the
term of five years, the consideration being one fifth of the hops
to be raised annually thereon. About the same time he en-
tered into an agreement with plaintiffs to cultivate, sell and
deliver to them 30,000 pounds of merchantable hops on or
before the 15th of October of each year during the term of his
leases, at 10 cents a pound, the plaintiffs to make certain ad-
vances to enable him to cultivate the yards and to harvest the
hops. Heise complied with his contract during the first two
years, except that in 1902 he attempted secretly to dispose of
about 35 bales of hops, but was prevented from doing so by
plaintiffs. When he settled with plaintiffs for the year 1902,
he had received such advances on account of his crop that there
remained only $288.50 due him for the season's work. The
plaintiffs charged him $69.49 for examining his hops, and also
assessed to him premiums for insurance on his crop taken
out in their names in pursuance of the terms of the contract
but the policies for which they refused to exhibit to him. The
controversy arising in relation to these matters culminated in
a notice given by Heise to plaintiffs that he would not longer
be bound by the terms of his contract, and that he should sur-
render his interest in the leases to the owners of the demised
premises. The plaintiffs thereupon offered to operate the yards
in fulfillment of the terms of the contract, but Heise refused
to assign to them any part of his term. Of the sum of money
so received he paid his brother-in-law $180, and being still in
debt, an action was instituted against him in a justice's court,
so that at that time he owed several hundred dollars and had
no money or property with which to make payment.

After the crops of 1902 were harvested, Mrs. Heise, leaving her husband in Polk County, came to Salem, where she sent her two sons and two daughters to school, paying their tuition in advance with money she had earned by picking hops and selling turkeys she had raised. Needing more money to support herself and family, she reluctantly conveyed to her brother, E. L. Harris, on December 3, 1902, an undivided interest in certain real property that she inherited from her father, receiving therefor $665. On the same day Heise executed to the owners of the hopyards releases of all his interests therein for the remainder of the terms, which relinquishments were accepted. E. L. Harris, December 4, 1902, and his mother, February 2, 1903, severally leased to the defendants Mrs. Heise and W. C. Heise, the hopyards so surrendered, for terms to expire October 1, 1905, in consideration of the lessees' agreement to give one fifth of the hops annually to be grown on the premises. About February 1, 1903, Mrs. Heise removed to Polk County, and with the money remaining from the sale of her patrimony supported her family and raised hops that year in the yards so leased to her and her son, her husband and children aiding her in the enterprise. The plaintiffs, April 4, 1903, mailed to Heise their check for $150, inclosed in a letter which stated that the money evidenced thereby was an advance on his hop contract with them, but he refused to accept it and returned the draft, writing them that he had no use for it. Mrs. Heise's mother and brother, during the season of 1903, furnished her and her son sustenance for their teams, supplied them tools and farming implements to enable them to cultivate the yards, and also loaned them the sum of $2,500, to pay the expenses of harvesting, taking as security therefor a chattel mortgage on the crop, pursuant to the terms of which they took immediate possession of the hops as soon as they were baled, and, after the injunction was dissolved, sold the same, retaining the sums due them and paying the remainder to Mrs. Heise and her son.

Though Heise assisted in cultivating and harvesting the hops, for which service it does not appear that he received any com-

pensation, his wife and eldest son, who was then a minor, employed, discharged and paid the persons who labored in the yards and about the dry houses. E. Seiwert, who was employed in the hopyard in 1903 by W. C. Heise and paid for his services by a check drawn on the bank by the latter, as defendants' witness, testified on cross-examination as follows:

"Q. Are you acquainted with A. Heise?

A. Yes, sir.

Q. Did you see him at that time?

A. Yes, sir.

Q. What was he doing?

A. Nothing; just joshing the boys; having a good deal of fun once in a while.

Q. Did you see him there all the time?

A. No, sir."

E. L. Harris, as defendants' witness, testified that in October, 1902, Heise told him he did not have sufficient money with which to operate the hopyards, and for that reason he was not going to rent them any longer; that the witness did not then begin to look for another tenant or think much about the matter until he obtained releases of the demised premises; that he negotiated with Mrs. Heise about two days before he secured her deed of the real property which she inherited from her father; and that after securing such releases and deed, he then advised his sister and her son to rent the hopyards, which proposal having been accepted, leases thereof were executed to them. Mrs. Heise, as a witness for herself, testified that, knowing her husband did not intend to raise hops in 1903, she sold her interest in the real property to obtain money with which to educate her children; that from the sum so received she paid an old grocery bill of about $100, which her husband was unable to liquidate; that after he had executed releases of all his interests in the demised premises and subsequent to the making of her deed, her brother told her that as she then had the necessary means, it would be advisable for her and her son to rent the hopyards, and that at his suggestion she consented to the proposal in pursuance of which the leases were made out to them.

1. From the foregoing testimony, plaintiffs' counsel insist that, as the contract which their clients consummated with Heise related to real property then leased to him and to the crops annually to be raised thereon, when the possession of such premises voluntarily passed to his wife and son, with knowledge thereof, they took the leases subject to the conditions imposed, and, though equity might not compel them to perform the labor necessary to produce a crop, when they did so, and the hops came into existence, plaintiffs were entitled thereto, but the crop having been sold by them they are liable to plaintiffs for the value thereof, which is the measure of the damages sustained, in refusing to give which an error was committed. Mrs. Heise and her son unquestionably knew of the contract, but notwithstanding such knowledge, if they were innocent of any attempt to defraud plaintiffs, they should not be punished because the husband of one of the defendants and the father of the other failed in business, whereby he was unable to perform the terms of his agreement. If Heise's financial embarrassment necessitated a relinquishment of his interests in the demised premises, or, if his anger, enkindled by being compelled to account for hops which he tried to secrete, or his resentment at what he considered to be exorbitant charges, prompted him to surrender his rights under the leases, plaintiffs' remedy was limited to an action against him for a breach of his agreement, and they cannot recover against his codefendants unless they participated in a scheme to defraud plaintiffs.

2. The relation existing between the defendants imposes upon Mrs. Heise and her son the burden of proving the *bona fides* of the part undertaken by them immediately preceding and during the time they had charge of the hopyards: *Jolly* v. *Kyle,* 27 Or. 95 (39 Pac. 999) ; *Feldman* v. *Nicolai,* 28 Or. 34 (40 Pac. 1010) ; *Schwartz* v. *Gerhardt,* 44 Or. 425 (75 Pac. 698).

3. After Heise settled with plaintiffs and received the money due him for the hops which he raised in 1902, he found it impossible to pay the debts which he then owed. It is fair, also, to infer that he was angry with plaintiffs and determined, if possible, to prevent them from securing any further advantages

under their contract with him. His wife, having the duty of supporting and educating her children thus unexpectedly thrust upon her, seems to have undertaken the task with characteristic fortitude, but her very limited means were evidently soon exhausted, and, after about two days of negotiations, she reluctantly acceded to her brother's earnest solicitation to convey to him her interest in the real property which she inherited from her father. Fraternal duty probably prompted E. L. Harris to desire that Mrs. Heise should make good use of the money which she had received, and having also obtained from her husband a relinquishment of all his interest in and rights to the demised premises, he recommended her and her son to take leases thereof and raise hops thereon. We believe that Mrs. Heise's testimony is true, to the effect that the first intimation she received concerning the possibility of the hopyards being again rented came from her brother, after he had secured her husband's relinquishments of all his rights in the premises, and after she had executed her deed.

Though Heise's resentment towards plaintiffs may have afforded a motive for his desire to renounce his rights under the leases, his lack of sufficient means to continue raising hops was evidently the controlling cause that induced such action; but, whatever the reason may have been that brought about such result, we think the testimony clearly shows that neither his wife nor his son was a party to any scheme, if such existed, to defraud the plaintiffs. Heise performed some labor in cultivating and harvesting hops. He was not a diligent worker, however, if the testimony of Seiwert, hereinbefore quoted, is to be believed. His wife surpassed him in the management of the hopyard, thereby demonstrating that she possessed the greater interest therein, which is a circumstance tending to corroborate her testimony respecting the *bona fides* of the transaction. If Heise had labored faithfully at the business, such work would not necessarily establish the fact that he was the beneficiary of a secret trust or render his wife's money that she had invested in good faith subject to the payment of his debts. In *McCormack Mach. Co.* v. *Pouder,* 123 Iowa, 17 (98

N. W. 303), Mr. Justice McCLAIN, speaking for the court, in discussing the legal principle arising under similar facts respecting labor performed by a married man, says: "But if, in fact, he saw fit to do just what he did for the purpose of assisting his wife and son in carrying on the farm and realizing profits therefrom, this would not render such profits subject to any extent to the payment of his debts. That a husband can render his services to his wife in the management of property belonging to her without rendering such property subject to the claims of his creditors is well settled in this state." To the same effect is, also, the decision of this court: *King* v. *Voos,* 14 Or. 91 (12 Pac. 281).

4. This suit was evidently instituted on the assumption that the defendant W. C. Heise had attained his majority. The testimony evinces, however, that he was not quite 21 years old. No question was raised at the trial as to whether or not he had been emancipated, and, as he was permitted to become a party to the leases, we shall assume that his father had given him his time before his grandmother and uncle executed to him and his mother such leases. His minority, under the circumstances supposed, did not render the labor he performed or the hops he helped to produce liable to the claims of his father's creditors: *Flynn* v. *Baisley,* 35 Or. 268 (57 Pac. 908, 45 L. R. A. 645, 76 Am. St. Rep. 495); *Clemens* v. *Brillhart,* 17 Neb. 335 (22 N. W. 779).

5. The releases given by Heise to his mother-in-law and to his brother-in-law were not voluntary, for their agreement to forego his obligation to pay them rent was a sufficient consideration for his relinquishments: *Whitman* v. *Watry,* 31 Wis. 639. So, too, the covenant of Mrs. Heise and her son to pay for the use of the hopyards was an adequate consideration for the execution of the leases to them.

6. We think the testimony clearly shows that Mrs. Heise and her son honestly entered into the contract for the leasing of the yards for their own use and benefit, and not in trust for Heise or any other person, and that it would be inequitable to permit advantage to be taken of the money which she expended

and of the labor which she and her children performed, in cultivating and harvesting the hops, to award against her or such son a recovery of any sum whatever as damages by reason of Heise's failure or refusal to keep and perform his part of the contract with plaintiffs. The testimony, which is uncontradicted, shows that the market value of the hops which Heise agreed to sell to plaintiffs was 24 cents a pound at the time they should have been delivered; that there were raised on the yards originally leased to him 23,040 pounds of hops, for which he was to have received 10 cents a pound, whereby plaintiffs sustained damages to the extent of 14 cents a pound. The court found, however, that the value of such hops at that time was only 22 cents a pound, making the loss sustained by plaintiffs $2,764.80.

7. The decree will therefore be modified so as to award plaintiffs a recovery against the defendant A. Heise of the sum of $3,225.60, but in all other respects affirmed; the defendants Rachel E. Heise and W. C. Heise to recover their costs and disbursements on this appeal.               MODIFIED.