Submitted on briefs September 18, reversed December 29, 1928.

## MARION AUTOMOBILE COMPANY *v.* ALVIN B. BROWN ET AL.

(272 Pac. 914.)

554

For appellant there was a brief over the name of *Mr. Robin D. Day.*

For respondents Oma Fay Smith and Charles Smith there was a brief over the name of *Mr. Wm. W. Harcombe.*

ROSSMAN, J.—The matters upon which the parties disagree bring forth issues of fact only. We have, therefore, perused the evidence with great care; the following constitutes a summary of that portion of it which we believe is material to the issues before us. In 1895 Mr. and Mrs. Brown were married. Shortly prior to that occasion Brown conveyed to his prospective bride title to 25 acres of the land involved in this suit. The deed to Brown, executed approximately two months prior to his deed to his bride recited that he had paid $400 for this land. Title to this 25 acres remained in Mrs. Brown until the deed, which is now attacked, was executed. As time went on Mr. and Mrs. Brown purchased several other tracts of adjacent land, until at the time of Mrs. Brown's death in 1919, the original tract had grown to 153 acres. The title to all of this, except 42 acres, was vested in Mrs. Brown's name. There is no evidence that Mrs. Brown was ever employed by anyone for wages or a salary, or had received any money from any source except from her husband. Brown testified that his wife was industrious, and had helped willingly in performing the work that was necessary

in taking care of this land. He had concluded, therefore, that the land belonged to her. Brown's occupation was in lumbering and in farming. His earnings in the former and the profits made off of this land enabled him to purchase these various tracts. The above states the manner in which the land was acquired.

We shall now review briefly the circumstances surrounding Brown, when he executed his deed to his daughter. At that time he was operating a small mill and needed a truck to haul logs. January 29, 1920, he purchased from the plaintiff, for the price of $3,500, a truck; the purchase price remained unpaid. The plaintiff believed from Brown's statements that he was the owner of the aforementioned land; due partly to this circumstance, it felt that he constituted a sufficiently good credit risk to justify it in extending credit. In January, 1925, the purchase price had not yet been discharged and in addition, Brown owed several other creditors. On the 29th of that month the plaintiff brought its action for $3,317, plus attorney's fees, interest and costs. Brown failed to answer and the plaintiff obtained judgment by default. Seven hundred dollars was obtained upon an execution; two more similar writs were issued, and when they were returned unsatisfied the present suit was brought. April 18, 1919, Mrs. Brown had executed a quitclaim deed in which her husband was the grantee; the property conveyed was the entire 153 acres with which we are now concerned; however, title to 42 of these acres was already vested in Brown. This deed was not recorded until February 16, 1925; Brown's deed to his daughter was executed the same day. Thus when the plaintiff instituted its action, title to the 153 acres was vested

in Brown, although the record title to 110 acres was in his wife's name.

■ ■ We shall now consider more specifically the circumstances surrounding Brown's conveyance to his daughter. February 16, 1925, when he recorded his wife's deed, and executed one from himself to his daughter, he was heavily in debt. It is deserving of notice that conveyances to a near relative by a grantor, who is harassed by debts, is frequently regarded as a badge of fraud; it is unnecessary to cite authorities. At about that time Brown had discussed with his confidants the advisability of seeking relief by way of bankruptcy; he had even discussed that matter with an attorney, and had gone so far as to inquire concerning the effect of bankruptcy proceedings upon the status of this land. One bit of advice, which apparently made quite an impression upon his mind, was to the effect that any false swearing in regard to the land in the bankruptcy proceeding would constitute a violation of the criminal law. We believe that the evidence fully justifies the finding that Brown had discussed with a Mrs. Keeney, who operated a boarding-house, which was maintained in connection with his mill, a plan to convey title to this property to her; the hope was entertained that such an act would put the property beyond the reach of his creditors. This plan was first conceived of in 1924, when a physician, who had attended Mrs. Brown in her last illness, threatened suit; at that time Mrs. Keeney inquired why he did not convey title to his children, and received the reply "he didn't have but one that would deed it back to him after he took bankruptcy"; that one was Oma, the defendant. Without reviewing this portion of the evidence further, we believe that it fully justifies

the conclusion that when Brown conveyed title to his daughter he was insolvent and greatly concerned with the problem of finding a means of reposing title to the property in some third person.

■ ■ Next, it is to be observed that this conveyance stripped Brown of substantially all his property. This finding is justified by the facts that the first writ of execution brought forth only $700, and then two later writs were returned wholly unsatisfied. Conveyances of all assets by insolvent debtors frequently are mentioned as a badge of fraud.

■ ■ We believe the evidence justifies a finding of secrecy and of haste. The deed from his wife to Brown was dated April 18, 1919; it was not recorded until February 16, 1925. On the same day Brown executed and recorded the deed to his daughter. He explained his long delay in recording his wife's deed by saying that he had deposited it for safe-keeping with a bank; that the bank lost it, and had not returned it until shortly before he recorded it. The disappearance and reappearance at the opportune moment is vouched for by no one except Brown. Neither Mrs. nor Mr. Brown had informed the children of the existence of the deed, although the former lived for four months after its execution; and Brown failed to advise the children of the long-continued disappearance of this instrument. Before executing the deed to his daughter, he had not discussed with her that matter, nor inquired as to her willingness to accept the conveyance. Her first news of this gift, and of the fiduciary duty thrust upon her, was received when Brown presented the deed to her hands. Mrs. Keeney, whom we have mentioned before, testified: "He (referring to Brown) said if he could go over to Falls City and get the deed that

his wife gave him and go down to Dallas and make a deed to his daughter at the same time, that he could beat the papers which the Marion Automobile Company was going to serve, which he did do.'' Haste and secrecy are badges of fraud; they are peculiarly persuasive.

Next, the evidence warrants the finding that the transfer was made in anticipation of a lawsuit. In fact, the attorney for the respondents, as a witness in their behalf, admitted that fact.

■ Further, we believe that the evidence justifies a finding that for at least two years after the conveyance Brown retained the custody of the farm and displayed toward it the same attitude as before the conveyance. In fact, the most that can be said in behalf of the *bona fides* of this phase of the transaction is that Brown became the agent for Oma Smith, and managed the property for her. Reflecting unfavorably upon this explanation of Brown's continued presence upon the premises, his collection of rent, payment of taxes, interest, etc., is the circumstance that the defendants thus contend that it was necessary for this insolvent father to manage gratis the farm for his three mature children, one of whom, a young man 29 years of age, was upon the farm during a part of the time the defendants contend the father managed it. Next, the father was indebted to the tenant and a portion of the rent was discharged by applying this debt toward the rent, an arrangement which was impossible if the father was not the owner. Further, the father managed the farm with such consummate skill, that income and outgo exactly matched each other: there was no deficiency which the children were required to defray, and there was no surplus for their pockets. These

circumstances, we believe, discredit the contention that the father was the agent of the children.

■ It will be observed that there is attached to the conveyance from father to daughter many of those circumstances which the courts frequently refer to as badges of fraud: secrecy, haste, the insolvency of the grantor, his retention of possession, a conveyance in anticipation of a pending suit, the transfer of all the debtor's property, and the kinship of the parties: *Garnier* v. *Wheeler*, 40 Or. 198 (66 Pac. 812); *Clarke* v. *Philomath College*, 99 Or. 366 (193 Pac. 470, 195 Pac. 822); *Weaver* v. *Owens*, 16 Or. 301 (18 Pac. 579); *Hesse* v. *Barrett*, 41 Or. 202 (68 Pac. 751); 27 C. J., Fraudulent Conveyances, §§ 133–156; 12 R. C. L., Fraudulent Conveyances, §§ 110–123. In addition, we shall later refer to two others, the failure to state the real consideration in the deed, and the failure to produce evidence in support of the trust. It should be observed that while the wife impressed the trust upon only the 110 acres, the title of which was vested in her, Brown's deed conveyed an additional 42 acres. This, we believe, reveals an eagerness to rid his name of all assets subject to execution. Some of the circumstances, which we have mentioned, do not bear great weight, but others are sufficiently material that they are deserving of earnest consideration. Before proceeding to weigh them, we shall consider the defendant's explanation of why the deed was executed. Brown contends that when his wife was in her last illness and was aware that death could not be long delayed, they agreed that she should convey this property to him, and that he should convey it to the children when they became of age and "had settled down." The following is his explanation in his words:

"Well, she wanted the children to have her property and the youngest girl was then only sixteen years of age, she wasn't of age and she wanted me to deed it over when she became of age and married and settled down. It was her request and' she gave me that deed with that understanding what I should do with it. And when that was over why then I went and done as I was requested."

Neither the deed from Mrs. Brown to the husband nor from the latter to his daughter mentions the foregoing agreement nor any trust. None of the children were aware of this arrangement; the defendant himself so testified. His daughter likewise stated that she was entirely ignorant of this matter until her father handed her the deed. The other two children were not sufficiently interested to attend the trial and resist the plaintiff's demands. The subscribing witnesses to the mother's deed were not produced in an endeavor to enlighten the court. In fact no one testified to this arrangement except Brown. He explained that one other individual, the wife of his former tenant, was aware of this agreement, and that he had served a subpoena upon her. Somehow she became lost or confused in Dallas, and neither her husband, Brown, nor the sheriff could locate her. No continuance was requested so that the court could have the benefit of her knowledge when she was found. It is worthy of notice that the deed which Brown prepared in an attempted fulfillment of the alleged agreement was not to all three children, but to one only; although he testified that the agreement contemplated that the property should be conveyed to all three. He endeavored to explain his failure in this particular by saying that a mortgage of $2,500 encumbered the property, and that its existence and the necessity for later refinancing

it diverted him from his original purpose. We are unaware of any serious difficulties arising from such a situation which would justify this explanation.

Further discrediting Brown's contention that his execution of the deed was in fulfillment of the alleged agreement are the following facts. Before execution of his deed he had frequently referred to his property as his own; this fact was testified to by the officers and salesmen of the plaintiff, as well as by Mrs. Keeney and her three sons. After title had become vested in the daughter, Brown again became anxious concerning the property, and made inquiries as to the wisdom of having his daughter convey title to a third person. Upon one occasion he and Mrs. Keeney sought advice from an attorney, but were dissuaded from their purpose when the attorney suggested that Mrs. Keeney would find it difficult to establish how she had paid for the property, due to her limited financial resources.

■ The defendant, Oma Smith, denied that she was aware of her father's precarious financial condition when she accepted the deed; she also denied knowledge of the fact that the plaintiff had a claim against him and was contemplating action upon it. However, the conveyance was a voluntary one; further, it was one from the father to a daughter. Such transactions are closely scrutinized by the courts when their *bona fides* are challenged by the grantor's creditors: *Coffey* v. *Scott,* 66 Or. 465 (135 Pac. 88); *Livesley* v. *Heise,* 48 Or. 147 (85 Pac. 509); *Garnier* v. *Wheeler,* 40 Or. 198 (66 Pac. 812).

■ The conveyance to the grantee being a voluntary one, it was not incumbent upon the plaintiff to prove that the daughter was aware of the fraudulent circumstances: Or. L., § 10174; 27 C. J., Fraudulent

Conveyances, § 176. Moreover, the burden was upon the defendants to establish the *bona fides* of this conveyance: *Coffey* v. *Scott, supra, Livesley* v. *Heise, supra.*

In many instances we have accepted the testimony of Mrs. Keeney where it came into conflict with that of Brown. We have felt justified in so doing, because Mrs. Keeney was possessed of but slight motive for falsification, and also, because of Brown's unsatisfactory explanation of the evidence which attacked this conveyance. For instance, he testified that he did not "intentionally" talk to Mrs. Keeney about conveying the property to her: likewise, he explained that all of these schemes were germinated in her mind; thus, he resorted to the Adamic explanation, that "the woman tempted me." Due to the fact, however, that he possessed one great advantage over the progenitor of us all, the advice of an attorney, he was able to resist the tempter with greater success than the original user of this overworked explication. The evidence assailing Brown's deed comes from many sources, while that in support of it, came from him alone. It is very significant that two of his children, who would be enriched if this deed were upheld, did not concern themselves with this suit.

The defendants especially contend that Brown's act in recording the deed from his wife materially strengthens their case. They argue that if he had concealed that instrument the property would have descended to his children, subject only to his estate of curtesy, and that, hence, only this latter limited estate would have been available for his creditors. However, title to 42 acres was vested in his name. Further such an arrangement would also have

barred Brown. And finally, the fact that the mortgage was about to mature, and needed refinancing, may have convinced him that it would be better to record the deed.

■ ■ The numerous badges of fraud, together with the other impeaching circumstances, which we have reviewed, seem to override the defendants' testimony to such a satisfactory extent that we are convinced the deed cannot stand. We have reviewed the evidence at length, owing to the fact that we are about to make a disposition of the suit different from that of the able judge of the lower court, who had the advantage of seeing the witnesses. But since we are thoroughly persuaded that Brown's deed to his daughter was actuated by improper purposes, and that no trust was ever impressed upon the land, we conclude that the deed should be declared null and void. It follows from this that the decree of the lower court is reversed and the cause is remanded, with instructions to enter a decree in favor of the plaintiff. The daughter, Oma, contends that she has expended some money in the maintenance of this property; her expenditures, beyond her receipts, are in the vicinity of $42; the lower court may pursue an accounting, and if any sums have been expended by her in the maintenance of the property, she should have a lien prior to the plaintiffs in that sum. Costs to the plaintiff.                          REVERSED.

COSHOW, J., dissenting.