Argued April 21, reversed June 2, 1960

KREBS *v.* LAY ET UX
352 P. 2d 577

*Elliott B. Cummins,* McMinnville, argued the cause for the appellant. On the brief were Cummins and Devlin, McMinnville.

*Norman L. Easley,* Portland, argued the cause for the respondent. With him on the brief were Seitz, Easley & Whipple, Portland.

Before McAllister, Chief Justice, and Warner, Sloan and Duncan, Justices.

SLOAN, J.

In his complaint plaintiff, a judgment creditor of defendant Edward H. Lay, alleged that defendants had fraudulently conspired to transfer assets from Edward H. Lay to his wife, defendant Nola I. Lay, and that Nola Lay secreted earnings derived from the use of such assets and surreptitiously paid them to Edward Lay. A jury trial resulted in a verdict for plaintiff; defendants appeal. A recital of the facts will precede a statement of the issue to be decided. We will refer to defendants as Edward and Nola. If we cannot specify with exactness some of the facts it is because the evidence, in those particulars, is uncertain.

Prior to 1950 Edward sold and manufactured pallets which were used by commercial and industrial establishments as a convenience in stacking goods. These pallets were wooden platforms used most frequently with fork lift trucks. The plant in which Edward conducted the manufacture of the pallets and the business of selling them was in a converted chickenhouse. The chickenhouse, as well as the home in which both defendants resided, was on a five acre tract owned by Nola. It is undisputed that the sole ownership of this real property had been vested in Nola for several years prior to all of the period of time to be mentioned in this opinion. The record does not show the source of her acquisition of the real property except that Edward had not contributed thereto nor had he any interest therein.

In 1950 plaintiff and Edward entered into a partnership. It was apparently the purpose of the partnership venture to expand Edward's business. At least, a larger plant was erected adjacent to Edward's original plant. It is assumed that additional machinery was installed in the larger plant. This plant was also located on the real property owned by Nola. The details of the partnership are unimportant and not in evidence except that both partners contributed to the assets of the venture. The partnership lasted for about fifteen months or until about June, 1951. The cause or financial result of its termination was not disclosed.

Thereafter, Edward appears to have continued to operate the business by himself. In oral argument before this court plaintiff's counsel referred to Edward as a "genius" in the field of the manufacture and sale of pallets. By 1954 his genius in the art had resulted in his complete insolvency and substantial

indebtedness. Included in the indebtedness were judgments in favor of plaintiff that totaled $25,806.89 at the time this case was tried. Also included were obligations to the First National Bank of McMinnville totaling some $16,000 secured by chattel mortgages on the plants, machinery and equipment. It appears that in about February 1954, creditors, other than those above mentioned, closed the plant. It remained idle for about six months and then the bank just mentioned, and hereafter referred to as the bank, placed Edward's father-in-law in possession of the plant with some form of authorization to try to operate it.

This did not prove satisfactory and in January and February of 1955 the bank instituted foreclosure proceedings and obtained a decree of foreclosure. The property was sold at foreclosure sale on February 15, 1955, and the bank bid in the property.[1] The testimony of the president of the bank reveals that sometime after the foreclosure sale he approached Nola with the proposition that she buy the foreclosed property and operate it herself. This witness' testimony also reveals that after the foreclosure the bank had had no transactions or negotiations of any kind with Edward.

In addition to the foreclosed chattel mortgages the bank had a mortgage on all of the real property owned by Nola. The mortgage secured a debt of about $15,000. Therefore, the bank proposed to Nola that she take over the foreclosed property and in consideration therefor that she give the bank her note in the amount of $31,000. This sum represented the total of the bank's

---

[1] The plaintiff presented evidence by which he attempted to show that the property foreclosed had a value at that time of almost $100,000. The plaintiff's estimate of the value must have been an afterthought. The record does not show that he, or any creditor, made an effort to buy the property at the foreclosure sale.

bid for the foreclosed property plus the indebtedness secured by her real property. The $31,000 was to be secured by real property mortgages on all of her real property and chattel mortgages on all of the personal property she was acquiring in the transaction. There is no evidence which indicates the value of her real property.

Nola testified that as long as she had to make a living she might as well try it by that means. On May 9, 1955, she consummated the transaction as above set forth. Edward signed the mortgage on the real property. The attorney for the bank who prepared the documents testified that the sole purpose of requiring Edward's signature was to foreclose any claim of curtesy that might accrue. Nola began the operation of the plant and Edward was utilized as a salesman. He worked full time at that task and, presumably, successfully so, but he was paid no salary or other compensation for his services. He received only his traveling and living expenses.

The business enjoyed some prosperity. It was stipulated by the parties that from May 9, 1955, until December 31, 1955, the net profit was $8,378.81. In 1956 the net profit was $8,920.75 and in 1957 it was $3,382.30. At the time of the trial of this case in May, 1958, the balance due on the $31,000 obligation to the bank had been reduced to about $23,000. Nola testified that most of the profit was reinvested in the business. The foregoing presents the basic facts. We need only consider the court's failure to direct a verdict for defendants.

■ Plaintiff classifies this case as one in the nature of trespass on the case for a tortious conspiracy to enable Edward to avoid payment of plaintiff's judgments. In addition to the allegations that Nola was secreting

money earned in the business and surreptitiously giving it to Edward, the complaint alleged that Edward was actually operating the business and Nola was a mere figurehead; that the two had conspired to transfer the assets to Nola and that the transfer was to delay, hinder and defraud creditors. The three allegations just mentioned were withdrawn from the jury by the trial judge. He correctly held there was no evidence to sustain these allegations.

■■ The trial judge submitted to the jury the allegation that "defendants have been and are now causing the income and profits of said business resulting from the efforts of Edward H. Lay to be diverted, secreted and held in the name of defendant Nola I. Lay and from time to time surreptitiously transferred to or applied for the benefit of Edward H. Lay by Nola I. Lay in order to prevent execution thereon. . ." The trial judge ruled that by "stretching" that allegation he would construe it to present the issue as to "whether or not there was a conspiracy on the part of the defendants and as a result of which the defendant Lay agreed to and did work for the company without compensation for the purpose of diverting to his wife and from his creditors what he should have been paid. . ." We think the court inserted a little too much elasticity into both the pleadings and the evidence.[2]

In a memorandum opinion supporting this construction the trial judge said: "The basic rule which the court believes applicable to the facts in this case on the basis of which it was submitted to the jury is most recently set forth in *Fidelity and Deposit Company of Maryland v. Studds,* 136 Fed. Supp. 756 [ED

---

[2] In fact, this was not the plaintiff's theory of his case. During the course of the trial plaintiff's counsel stated that: "The basis of our action is a transfer of these assets and the surreptitious payment of monies to Edward Lay."

Va 1956]." *Fidelity and Deposit Company of Maryland v. Studds* has now been reversed by the Circuit Court of Appeals for the Fourth Circuit. *Studds v. Fidelity and Deposit Company of Maryland,* 267 F2d 875 (4th Cir 1959); cert den 361 US 876. The case, therefore, can no longer be considered as authority to support plaintiff's position in this case. The substance of the opinion of the United States district judge in the Studds case was that by the law of the state of Virginia it was deemed fraud upon a husband's creditors for the husband to work for his wife without compensation. The Circuit Court of Appeals, as stated, reversed and held that the Virginia Supreme Court of Appeals had held to the Contrary in *Childress v. Fidelity, Etc., Co.,* (1952) 194 Va 191, 72 SE2d 349, 35 ALR2d 1. The Childress case presents facts much more favorable to the plaintiff's position than does the instant case. Nevertheless, the court refused to permit recovery against the wife. The case places the Virginia court in accord with the great majority of courts in the United States, including Oregon. 28 ALR 1046.

There is no occasion to discuss the cases found in the ALR annotation and other cases cited by plaintiff. Oregon has followed the majority. The rule this court has followed is typically expressed in *Heckinger v. Swank* (1916) 78 Or 526, 530, 153 P 784:

> "In *King v. Voos,* 14 Or. 91 (12 Pac. 281), followed in *Livesley v. Heise,* 48 Or. 147 (85 Pac. 509), it was decided that a debtor may rightfully give his services, however valuable, to his wife, and that his creditors cannot complain of his so doing. That is all that appears to have been done in the present instance. Starting with her own money, the wife might rightfully avail herself of the services of her husband and his business acumen in the manage-

ment of her property to the betterment of her holdings. A time there was when men might be themselves sold and compelled to render their personal services to those who purchased them; but that is not the law now."

In language tinctured with understanding, but not illusion, Professor Glenn in his work on Fraudulent Conveyances and Preferences expresses the mood of most of the courts.

"Nor is the point obscured when it features the relation of husband and wife. It may be rather quaint to-day for an energetic wife to support, or at least stand by, an insolvent husband, but still it does seem to happen. Sometimes, of course, the situation is not devoid of the practical, as we will later see when we meet the husband who 'does business in his wife's name'. Another piece of teamwork, however, appears when the wife goes along with her own business and the husband who can do well in everybody's affairs but his own, gives the wife his services free. She supports him because she loves him,—at least, so she testifies,— but as there was no bargain as to wages, how can the husband's creditors get at the wife or her business? If there is unjust enrichment of the wife at the husband's expense, he has a claim which is available to his creditors as an asset, but how can there be unjust enrichment in the case of services freely rendered because of love, or the ties of habit, and considerations like that? It would be just as logical for the husband's creditor to demand the wife's old engagement ring, if she still has it. That is what our cases hold." 1, Glenn, Fraudulent Conveyances and Preferences, § 140, p 260.

The facts in the case of *Everson v. Wood* (1911) 59 Or 285, 287, 117 P 299, are very close to the facts in this case. Justice McBRIDE expressed the opinion of the court:

"The foregoing statement contains the material

facts as we find them. To attempt to give the testimony, or even a synopsis of it, in detail would needlessly consume time and space. We are of the opinion that the court below found correctly that Mrs. Glenn Wood was not a party to any fraud against H. E. Wood's creditors. There is no claim here that her doing business under the name of H. E. Wood & Co. misled any creditor into dealing with H. E. Wood personally, or extending credit to him in the belief that he was a member of the firm. In fact, there is no suggestion that Wood has ever contracted any debt since the arrangement between his wife and himself was entered into. Unless she was carrying on his business in her firm name for his benefit, she cannot be held to account to his creditors, and this fact is not shown by the evidence.

"While transactions of this character, between husband and wife, will be more closely scrutinized than if they were between persons not related, yet the mere fact of such relationship is not of itself sufficient to justify the court in declaring them fraudulent. H. E. Wood had mechanical skill, but lacked education and business ability and money. Mrs. Wood had money, property, education, and business capacity. Wood's ventures before this arrangement had always resulted in failure. When his wife put her property and brains into the business, it was a success. Here is the 'proof of the pudding.' The woman had foresight enough to see that, by using her brains and thrift and employing her husband's mechanical skill and industry, she could make a success of the business, and now that she has done so, in a small way, we are not inclined to turn the fruits of her enterprise over to her husband's creditors. * * *"

Another very similar case with like holding is *Livesley v. Heise* (1906) 48 Or 147, 153, 85 P 509.

■ It follows that the trial court was in error in holding that the fact that Edward worked for Nola

without compensation was enough to show a fraudulent scheme to divert earnings from Edward's creditors. Instead, it was incumbent on the plaintiff, as his attorney stated, to carry the burden of proving that the transfer of the assets to Nola was fraudulent and that she was secreting earnings and surreptitiously paying them to Edward. We have already noticed that the trial court properly found that there was no evidence that the transfer of the assets was fraudulent. Nola acquired the physical property for a full and valid consideration. The only means of proving to the contrary would have been to show that the bank was a participant in a fraudulent scheme to avoid Edward's creditors and that it foreclosed the mortgages and sold the property to Nola in furtherance thereof. Nothing of the kind is or could be suggested.

In addition, it was necessary for plaintiff to prove the allegation that Nola, as a part of a scheme or conspiracy, secreted money and surreptitiously paid it to Edward. There is no evidence to support this contention. The books and records kept by Nola were never produced or inquired into. Nothing in the record shows that plaintiff subpoenaed the books, records, and income tax returns or made any other effort to examine the records that would have been essential to prove plaintiff's case. There is no testimony that even hints that every penny of income and every item of expense would not have been recorded in the books of account, if produced. The amount of profits earned by the business, before mentioned, was put in the record by stipulation. No one testified that the amounts stipulated did not present a true profit picture or that other profits were earned and secreted. There is nothing in the record to show the gross income of the business or the nature or amount of the costs charged

against gross income. No one testified that income tax returns had been filed that did not reflect the income and expenditures. It would be a rare case in which a litigant could prove allegations such as plaintiff's without evidence of unrecorded income or unexplained costs or that the party charged with secreting income kept no records at all. To permit the jury to decide if income had been secreted, without such evidence, would permit pure speculation.

Nor is there any testimony of surreptitious payments to Edward. He was paid his expenses and the records of these expenses and payments are in evidence in some volume. Again, no other witness questioned the veracity of the expense records or that any payment thereof was false, or that Edward had received more money than shown by the expense records. There is no evidence of any other payments at all.

■ We can find no evidence that Nola was a figurehead for Edward other than the fact that they were husband and wife. Although this may create a suspicion, it does not prove that such was the fact. In *Keller v. Commercial Credit Co.* (1935) 149 Or 372, 376, 40 P2d 1018, 96 ALR 1235, it was held that: "The charge of conspiracy must be based upon something more substantial than suspicion." The evidence presented proves to the contrary. That is, that Edward may be a good salesman but cannot manage the financial responsibility of such a business. The evidence is undisputed that when he was in command debts, rather than profits, accumulated. Since Nola has been in charge the debt she incurred is being paid and the business operated at a profit. The trial court properly found an absence of evidence that Nola's presence in the business was a sham and cover-up for Edward.

Plaintiff's own testimony is to the contrary:

"Q Do you have any independent knowledge of what Mrs. Lay's function in the business has been since May, 1955?

"A Yes. I guess she is owner of it.

"Q Has she operated the business?
"A She operates and runs it.

"Q Now, do you know whether or not Mr. Lay has done any of the operating to your knowledge?
"A All I know is he is a salesman."

We are satisfied that this case should never have been submitted to the jury. We have considered all of the record and arguments advanced by plaintiff but find a lack of any substantial evidence to support his allegations. If the Studds case had been reversed prior to the trial of this case we are certain the able trial judge would have sustained the motion for a directed verdict. The case is reversed with directions to enter a judgment for defendants.