Paul N. KUDERER and LaVaughn Kuderer, husband and wife, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. No. 87–1414–FR.

United States District Court, D. Oregon.

June 1, 1990.

Paul N. Kuderer, LaVaughn Kuderer, Salem, Or., for plaintiffs.

Charles H. Turner, U.S. Atty., William W. Youngman, Asst. U.S. Atty., Portland, Or., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

FRYE, District Judge:

This matter came before the court for trial on October 31, 1989 and was continued to November 9, 1989. The court, having considered the evidence and legal arguments of the parties, enters the following Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52(a).

## FINDINGS OF FACT

Plaintiffs, Paul N. Kuderer and La-Vaughn Kuderer, seek quiet title to 72 acres of farm land located in Marion County, Oregon. The property was purchased by defendant, the Farmers Home Administration of the United States (FmHA) at a sheriff's sale on June 16, 1987. The FmHA asserts counterclaims for the ejectment of the Kuderers and for rent from June 16, 1987 to the present.

The Kuderers purchased the land from the Acoff Trust in 1978, giving the Acoff Trust a promissory note in the sum of $64,094. The Acoff Trust secured the promissory note by recording a trust deed on the property in the real property records of Marion County on April 28, 1978.

On November 16, 1979, the Kuderers gave the FmHA a mortgage on the property to secure a loan for $71,000, which mort-

gage was recorded on November 21, 1979. On September 6, 1979, the Kuderers gave the FmHA another mortgage on the property to secure a loan for $29,700, which mortgage was recorded on January 14, 1982.

On March 18, 1987, the Acoff Trust foreclosed its trust deed. The FmHA purchased the property at a sheriff's sale held on June 16, 1987 for the sum of $117,111. Following the sheriff's sale, the FmHA mailed a certified letter to the Kuderers on June 18, 1987, offering them the opportunity to purchase or lease back the property. On June 22, 1987, David Nicholson, county supervisor for the FmHA in Clackamas, Oregon, offered to lease the property to Paul Kuderer and his wife on the standard terms of the FmHA for the sum of $4,300 per year. The Kuderers obtained lease documents with these proposed terms on June 26, 1987.

On July 1, 1987, Paul Kuderer told Nicholson that he would not accept the form of lease proposed by the FmHA and proposed an alternative form of lease. Paul Kuderer mentioned that he would try to buy back the property if he could get financing. Nicholson told Paul Kuderer that unless there was a lease, the crops growing on the property belonged to the FmHA. AT this time, Paul Kuderer had not submitted an application to the FmHA for financing to buy back the property, and Paul Kuderer did not ask Nicholson for information regarding such an application. Nicholson then sent the Kuderers a letter dated July 1, 1987, in which he stated that the FmHA's offer to lease the property to the Kuderers had been withdrawn and asked the Kuderers to vacate the property.

On July 20, 1987, Nicholson received a telephone call from D. Olcott Thompson, a lawyer for the Kuderers, who asked for the Kuderers' "loan balance." Nicholson provided this figure based on the most recent information available to him. Thompson did not mention that the Kuderers wanted the information in order to buy back the property, and Nicholson assumed that the inquiry was related to the Kuderers' bankruptcy proceedings. The loan balance is not the same as the amount necessary to buy back the property, which is based on an appraisal of the capitalization value of the property.

On July 22, 1987, Nicholson received a letter from Thompson, enclosing a registered draft in the amount of $116,078.93. The draft is drawn upon "BSL International" (BSL) and is made payable to "Farm Home Loan Administration." Thompson's letter asks the FmHA to convey the property to Paul Kuderer and to release all liens against the property. Pursuant to the routine practices of the FmHA, the draft was endorsed upon its receipt. Nicholson became concerned about the negotiability of the draft after one of his subordinates, Cindy Greene, noticed that the draft had no bank numbers. Greene called the telephone number given for BSL on the draft, and a child answered the telephone. Greene then talked to an adult, but was not reassured as to the validity of the draft.

Nicholson and another subordinate, Jan Younger, took the draft to The Oregon Bank, which is the bank used by the FmHA. The Oregon Bank would not cash the draft, deposit it in the account of the FmHA, or take the draft for collection because BSL does not have an account with the Federal Reserve Bank. Nicholson therefore decided to mail the draft back to Thompson and wrote the word "void" on the endorsement.

On July 24, 1987, Nicholson sent the draft back to Thompson with a letter stating that the FmHA could not accept it because 1) the correct price to buy the property was $117,111; and 2) The Oregon Bank would not accept the draft. Nicholson requested that any future payments be made by cashiers checks or other readily negotiable checks which banks will accept in exchange for cash. However, Nicholson stated that the FmHA would process for payment any drafts received, although it would not release any security until funds were received on such a draft.

On July 28, 1987, Thompson sent the draft to Nicholson again, contending that the FmHA had accepted the draft and that the FmHA must attempt to collect the

draft. Nicholson again took the draft to The Oregon Bank, which rejected it after sending a copy to the head office for review. Nicholson referred the matter to the state director of the FmHA, David Chen. By letter dated August 10, 1987, Chen explained to Thompson that the loan balance given to Thompson was not the amount necessary to buy back the property. Chen also stated that the draft offered as payment would not be negotiated and that any pay-off should be in the form of cash or a certified check with Farmers Home Administration shown as the payee.

During the following months, the Kuderers and Thompson engaged in negotiations with Chen and with Arno Reifenberg, regional attorney for the FmHA. As a result of these negotiations, Nicholson was directed to send the draft to BSL for payment with the understanding that the Kuderers would make up the difference between the amount of the draft and the agreed price for the property of $117,111. Nicholson sent the draft to BSL by means of a certified letter dated October 20, 1987.

Brad Bagge, the principal of BSL, called Nicholson on October 28, 1987. Bagge indicated that BSL could not make payment on the draft at that time. Subsequent communications between the Kuderers, Thompson, Bagge and the FmHA did not resolve the matter, and the draft has never been paid.

On August 15, 1984, Paul Kuderer and his son, Kenneth Kuderer, signed a document entitled "Lease." The lease states in full:

> I, PAUL KUDERER DO HEREBY LEASE TO KENNETH KUDERER, ALL OR PART OF THE 108 ACRES WHICH IS LOCATED ON 99E 1½ MILES NORTH OF BROOKS.
> IT IS AGREED THAT KENNETH KUDERER WILL ASSIST PAUL KUDERER IN THE CARE AND HARVEST OF THE WHITE CLOVER AND WILL MANAGE HIS FARMING IN A HUSBAND LIKE MANNER.
> THE LIFE OF THIS LEASE SHALL CONTINUE AS LONG AS KENNETH KUDERER MAINTAINS CONTRACTS TO RAISE CROPS AND OR 1994 CROP YEAR.
> MONITARY VALLUE [sic] OF SAID LEASE IS VERITABLE TO THE NEED TO MAKE PAYMENTS AND TAXES DUE ON SAID LAND.

Pl.Ex. 25. The lease was not recorded or notarized.

Paul Kuderer testified that the consideration for the lease was that Kenneth Kuderer was to make all mortgage and property tax payments for the property. Kenneth Kuderer testified that he has been farming the land in question since 1984, and that he is currently growing crops on the land. Kenneth Kuderer testified that he has not paid any rent to anyone since the sheriff's sale of the property. Paul and LaVaughn Kuderer continue to live on the property under a sublease from Kenneth Kuderer. No evidence was presented as to the terms of the sublease.

BSL is an unincorporated business association trust which is registered as a private surety with the State of California. The business address of BSL in Foster City, California is a mail box service building, and the telephone number of BSL is the number for Bagge's residence. The purpose of BSL is to help secure financing for its clients.

## CONCLUSIONS OF LAW

### 1. *Quiet Title*

The Kuderers contend that the FmHA should be required to convey the property to them and to release all of its interest in the property because the Kuderers have properly tendered payment for the property. The Kuderers contend that the draft was not paid only because it was not properly processed by the FmHA. The Kuderers argue that it was unreasonable for the FmHA to demand payment by a further BSL draft, and to demand payment by cash or cashiers check.

█ The parties raised a number of issues regarding whether the FmHA made proper presentment of the draft and whether the draft was dishonored by BSL. However, before considering these issues, the

court must determine whether the draft constituted a valid tender of payment by the Kuderers. Under the law of the State of Oregon, "the term 'tender' has definite legal significance imparting not merely the willingness and intent to perform but also the ability at the time of tender to pay in accordance with the offer." *Bembridge v. Miller*, 235 Or. 396, 402, 385 P.2d 172 (1963). Thus, a tender must be more than an offer of payment at some future time.

The *Bembridge* decision cites *Eastern Oregon Land Co. v. Moody*, 198 F. 7 (9th Cir.1912), in which the plaintiff had given a written offer to pay money, yet lacked the ability to pay. In finding for the defendant payee, the court stated that a valid tender of payment "must be made by one who has the present ability to make the tender good, and the burden of proof is upon the plaintiff to show that he has such ability." 198 F. at 18.

■ Paul Kuderer and Brad Bagge testified at trial that BSL is not a bank, but is more like an escrow or title company. Bagge testified that the draft was not a cash instrument, and that BSL could not have sent cash to the FmHA upon presentment of the draft. Indeed, BSL does not have a checking account or any funds of its own. Bagge explained that upon presentment of the draft, he would try to secure financing based on a promissory note from the Kuderers and a mortgage on the property in question.

Bagge stated that he would first try to negotiate financing through the FmHA. If that attempt was unsuccessful, he would attempt to secure financing for the Kuderers' "package" from private investors. Finally, BSL would attempt to secure credit from the Federal Reserve Board. Bagge testified that no BSL drafts have ever cleared, and that BSL has not secured financing for any of its clients. Bagge asserted that this is because none of the payees (in this case, the FmHA) have had the forebearance to work with BSL and its clients. Paul Kuderer testified that no other means of financing was available to the Kuderers.

The court finds from the testimony of Bagge and Paul Kuderer that neither BSL nor the Kuderers had the present ability to pay the draft. Thus, the Kuderers did not make a proper tender of payment because the BSL draft was not an instrument redeemable for cash or a cash equivalent. The court finds that the FmHA acted reasonably in attempting to process the draft for payment and in remaining willing to accept payment by cash or certified check. The FmHA attempted twice to collect the draft through its bank, and after the bank refused to accept the draft for collection, the FmHA attempted to collect the draft directly from the drawee, BSL. At that time, October of 1987, the FmHA became aware that BSL did not have the present ability to pay the draft.

Bagge's testimony established that the ability of BSL to eventually secure financing for the Kuderers' package was highly speculative as BSL had not yet been able to provide financing for any of its clients. Bagge did not state any time period in which he expected to secure financing. The Kuderers' evidence indicates, at most, a possibility that BSL could have secured financing to pay the FmHA, if the FmHA had sufficient forebearance. This evidence does not satisfy the Kuderers' burden to show a present ability to make payment.

Accordingly, the Kuderers have failed to establish their claim to quiet title to the property.

2. *Ejectment and Claim for Rent*

As discussed above, the FmHA is the owner of the property at issue. The FmHA contends that it is entitled to immediate possession of the property and to an award of the fair rental value of the property since June 16, 1987, the date of the sheriff's sale.

The Kuderers contend that the FmHA is not entitled to possession of the property because the property is under lease to Kenneth Kuderer until 1994. The Kuderers contend that the FmHA must collect any rent from Kenneth Kuderer, and that as mere sublessees, they are not obligated to pay rent to the FmHA.

The FmHA argues that the agreement between Paul Kuderer and Kenneth Kuderer is not a valid lease as against the FmHA. The FmHA contends that even if the lease is valid, Kenneth Kuderer is entitled to possession under the lease only until the redemption period runs. The Kuderers respond that while the FmHA had the right to terminate Kenneth Kuderer's lease when the redemption period expired, the FmHA never acted to terminate the lease.

Under O.R.S. 23.590, the purchaser of property sold at a sheriff's sale is entitled to immediate possession of the property. However, if the property is held by a tenant under an unexpired lease, the tenant is entitled to remain in possession until the expiration of the redemption period. *Id.* The purchaser is entitled to receive from such a tenant the rent or the value of the use and occupation of the property during the redemption period. *Id.*

■ In this case, the redemption period terminated one year after the sheriff's sale—that is on June 16, 1988. The cases decided under O.R.S. 23.590 and its predecessor statutes hold flatly that a tenant is not entitled to possession of the land beyond the period of redemption, despite the fact that the tenant's lease is for a longer period. *Foley v. Bouvy,* 158 Or. 327, 335, 75 P.2d 14 (1938). This ensures that the mortgagor may not materially diminish the value of the mortgaged property as security for the debt by simply leasing it for a long period of time for a nominal rent. *United States Mortgage Co. v. Willis,* 41 Or. 481, 484, 69 P. 266 (1902).

Thus, it was not necessary for the FmHA to act to terminate Kenneth Kuderer's lease after June 16, 1988. Moreover, as an alternate ground, the court finds that the assertion by the FmHA of its right to possession in this action and in the connected case, *Kenneth Kuderer v. United States,* Civil No. 87–1442–JU, constitutes adequate notice of its intent to terminate the lease of Kenneth Kuderer.

■ The remaining issue is whether the lease between Paul Kuderer and Kenneth Kuderer is valid. The FmHA, relying on several cases regarding fraudulent transfers, argues that a transfer between family members must be closely scrutinized where the effect is to defeat the rights of a bona fide third party. *See, e.g., Branchfield v. McCulley,* 192 Or. 270, 231 P.2d 771 (1951); *Marion Auto. Co. v. Brown,* 127 Or. 551, 272 P. 914 (1928).

The evidence with respect to the lease is equivocal. The lease was not notarized or recorded. The terms of the lease are somewhat vague, and the consideration for the lease is not clearly spelled out in the lease. However, the lease was executed in 1984, before any dispute arose between the Kuderers and the FmHA. There is no evidence that the lease was executed in order to defeat the rights of any creditor. Paul Kuderer testified that the consideration for the lease was that Kenneth Kuderer was to make all mortgage and property tax payments for the property. Although it is uncertain whether Kenneth Kuderer actually made such payments, there is no evidence that the amounts due for mortgage payments and property taxes were inadequate consideration for the lease.

The behavior of Paul Kuderer after the sheriff's sale is subject to differing interpretations. Paul Kuderer applied to lease the property from the FmHA after the sheriff's sale, but rejected the lease offered by the FmHA, and then turned his efforts to buying back the property. This behavior could be interpreted to indicate that Paul Kuderer did not consider Kenneth Kuderer to be the lessee of the property. However, Kenneth Kuderer also inquired about leasing the property from the FmHA shortly after the sheriff's sale, and Kenneth Kuderer continued to farm the property and to assert ownership of the crops on the property. The behavior of Paul Kuderer and Kenneth Kuderer could be interpreted as an abundance of caution to ensure that whoever the FmHA deemed to be the proper lessee would have a chance to lease the property.

Although the lease is between family members, the FmHA has not presented evidence sufficient to justify shifting the burden of proving the validity of the lease to the Kuderers. The court finds that the

**1428**

FmHA has not established that the lease was invalid. Therefore, the FmHA must look to Kenneth Kuderer for payment of rent for the period from June 16, 1987 to June 16, 1988.

As to the period after June 16, 1988, the Kuderers are liable to the FmHA for the reasonable rental value of the property. *See Miller v. Engelson*, 225 Or. 300, 302, 358 P.2d 276 (1960). Kenneth Kuderer testified that a reasonable rent for the property would be $30 to $50 per acre per year, which would be a total of $2,160 to $3,600 per year for 72 acres. Nicholson testified that the reasonable rental value of the property is $75 per acre per year, a total of $5,400 per year. In June, 1987, the FmHA offered to lease the property to the Kuderers for a total of $4,300 per year, which would be approximately $60 per acre. The court finds that $4,300, the amount at which the FmHA was actually willing to lease the property, represents the reasonable rental value of the property.

Therefore, the FmHA is entitled to immediate possession of the property and to an award of rent at the rate of $4,300 per year from June 17, 1988 to the date upon which the FmHA gains possession of the property.

## CONCLUSION

The court finds against the Kuderers on their claim to quiet title to the property. The court finds in favor of the FmHA on its counterclaim for ejectment and for rent. The FmHA is granted immediate possession of the property and rent at the rate of $4,300 per year from June 17, 1988 to the date upon which the FmHA gains possession of the property.

This opinion constitutes Findings of Fact and Conclusions of Law pursuant to Fed.R. Civ.P. 52(a). The FmHA shall prepare a judgment in accordance with this opinion.